## WARD v. WARD et al.

## WARD et al. v. SAME.

### (Circuit Court, S. D. New York. August 17, 1904.)

1. MORTGAGE—FORECLOSURE SALE—NECESSITY OF CONFIRMATION.
   Under the law of New York, the failure to procure an order confirming a referee's report of sale in a foreclosure suit does not invalidate the purchaser's title, where he has paid the consideration and received a deed from the referee.

2. SAME—VALIDITY—FAILURE TO RECORD.
   The fact that a mortgage covering both personal and real estate was not filed does not invalidate it as between the parties under the law of New York.

3. SAME—MORTGAGEABLE INTEREST—ESTATE IN EXPECTANCY.
   A testator left his residuary estate in trust, the interest therefrom to be paid to a beneficiary during her life, and the principal at her death to be divided equally between three cousins of the testator; the children of either, should he die before the termination of the trust, to take in his place, and, should either die leaving no children, the estate to be divided between those surviving or their children. *Held*, that each of the cousins took a contingent estate in expectancy, which, under the New York statute (1 Rev. St. pp. 722–725, pt. 2, art. 1, c. 1, tit. 2), which provides that "expectant estates are descendible, devisable, and alienable in the same manner as estates in possession," was alienable, and could be mortgaged, although from the nature of the contingency attached neither descendible nor devisable.

4. SAME.
   One of the cousins mortgaged his interest, which was sold under foreclosure, and bought by another of the cousins, who died intestate before the termination of the trust; the mortgagor, however, surviving. *Held*, that while the estate in expectancy of the purchaser, under the will, was terminated by his death, the interest acquired by his purchase was not affected thereby, but passed to his heirs, and became vested in them on the termination of the trust during the life of the mortgagor.

5. SAME—PRESUMPTION OF VALIDITY.
   Where the devisee of a contingent interest in an estate gave a mortgage thereon to the executor, which was foreclosed by regular proceedings, and the interest sold to another devisee, who gave a like mortgage thereon to the executor, it must be presumed, in the absence of evidence to the contrary, that the transaction was bona fide, and divested the first mortgagor of his interest, although no reason for it appears.

6. ESTOPPEL—EXPRESSION OF OPINION.
   The expression of an opinion by one of the parties, on a question of law, where both parties have full knowledge of the facts, cannot create an estoppel.

---

¶ 2. See Chattel Mortgages, vol. 9, Cent. Dig. § 152; Mortgages, vol. 35, Cent. Dig. § 199.

7. Dower—Estate in Expectancy.

Under the law of New York a wife has no dower rights in lands in which her husband has only an estate in remainder expectant upon a life estate.

## In Equity.

These actions were tried and argued together. They both relate to the same subject-matter and the main controversy is identical in each. The first action is for a distribution of personal property; the second for a partition of real estate under the will of Henry H. Ward upon the termination of a trust estate created by said will. The defendant Evarts is not personally interested in the controversy and is joined as defendant in the first action because he holds the personalty as trustee or custodian. The city of New York is made a defendant in the second action in order to bar any lien for taxes. The vital question, therefore, is how the property, real and personal, shall be divided between Charles H. Ward and wife, complainants, and Maria E. G. McK. Ward and Caroline C. Ward.

Henry M. Ward, for complainants.
William G. Wilson, for defendants Ward.
Allen W. Evarts, in pro. per.

COXE, Circuit Judge (after stating the facts). Henry H. Ward died August 27, 1872, leaving a will, executed July 31, 1872, whereby, after making certain minor devises and bequests, he left all the rest, residue and remainder of his estate to his executors to hold during the life of his cousin Eliza Ann Partridge in trust, the income to be paid to her during her life. The will then proceeds as follows:

"Upon the termination of such trust by the death of said Eliza Ann Partridge, I give, devise and bequeath the capital of such trust estate, as the same shall then exist, unto my three cousins, William G. Ward, Charles H. Ward and John Ward, sons of my deceased uncle William G. Ward, in equal shares, in fee simple and absolutely, and to their heirs, representatives and assigns forever; if, at such time of the termination of the trust, either of my said three cousins, William, Charles and John, shall be dead leaving issue who shall then be living, such issue shall take in his place, per stirpes and not per capita, absolutely, and in fee simple, the shares of the capital of such trust estate, which he would have taken if living, and if, at the time of such termination of the trust, either of my said cousins, William, Charles and John, shall be dead and there shall be no issue of him at such time surviving, the share of the capital of said trust estate which would have gone to the one so dead, if he had been living, shall pass in equal shares in fee simple and absolutely, to the then survivors or survivor of my said three cousins, William, Charles and John, and to the then surviving issue, if any, of any of them who may have previously died, leaving issue surviving until such period, such issue to take by representation and per stirpes and not per capita, and only the share which their ancestor would have taken if he had survived the termination of the trust; and I give, devise and bequeath the capital of said trust estate, upon the termination of the trust by the death of my said cousin, Eliza Ann Partridge, in accordance with the foregoing provisions."

Miss Partridge died September 19, 1902, John Ward died, intestate, August 9, 1896, without issue, his brothers William and Charles being his only heirs at law and next of kin. He left little available property, hardly enough to pay his debts. William G. Ward, a widower, died, intestate, January 16, 1901, leaving as his sole

¶ 7. Estates subject to dower, see note to Black v. Elkhorn Min. Co., 3 C. C. A. 316.

surviving issue his two daughters, the defendants, Maria E. G. McK. Ward and Caroline C. Ward. Charles H. Ward, the complainant, was the only survivor of the three cousins of the testator mentioned in the will. When, therefore, the trust terminated September 19, 1902, the persons entitled, under the terms of the will, to the capital of the trust estate were Charles H. Ward and the issue of William G. Ward—Maria E. G. McK. Ward and Caroline C. Ward—half going to the complainant and half to the defendants Ward; one-fourth to Maria E. G. McK. Ward and one-fourth to Caroline C. Ward. Charles E. Butler and the complainant were appointed executors and trustees under the will. Charles E. Butler died May 1, 1897. On September 1, 1897, the complainant having resigned as executor, Prescott Hall Butler was appointed trustee. He died in 1901, and the defendant Allen W. Evarts was appointed sole trustee or custodian of the trust funds.

The defendants insist that the complainant is not entitled to take under the will for the reason that all his interest in the estate, real and personal, was transferred to John Ward and that his sole interest in the estate is as heir at law and next of kin of John Ward. The transfer was accomplished in the following manner: On October 24, 1874, William G. Ward and Charles H. Ward, for the purpose of securing their indebtedness to the estate of Henry H. Ward, executed their bond to Charles E. Butler, as executor, in the sum of $50,000, conditioned for the payment of $25,000 and interest, and as security for the payment of this bond each, severally, gave a mortgage covering all his interest in the estate of Henry Hall Ward "both real and personal of every kind and description whatsoever and wheresoever situated which belonged to the said Henry H. Ward deceased at the time of his death." These mortgages were duly foreclosed and the property was bid in by John Ward for $49,000, who received from the referee a deed covering all the real and personal property "whereof Henry H. Ward died seised or possessed, and which constitutes a part of his residuary estate." This property is specifically described in the deed.

The court has not the slightest doubt that this mortgage was properly and regularly foreclosed after personal service of the summons upon Charles H. Ward and that he had general knowledge, at least, of the foreclosure and sale. To prove this it is only necessary to refer to two pieces of testimony.

First. On July 1, 1887, he wrote a note to the attorneys in the foreclosure suit, informing them that one of the defendants "in the above suit * * * holds a judgment against another Charles H. Ward." This note is entitled in the foreclosure suit and imports knowledge by the writer of the character of the action.

Second. In an account of Charles E. Butler and Charles H. Ward, as executors, appears the following item:

"1888 January 23 Bond and Mortgage of John Ward, secured by premises covered by mortgages made by Charles H. Ward and William G. Ward foreclosed $25,000"

Over his own signature the complainant acknowledged that he had examined this account, found it to be correct and ratified and ap-

proved it. The failure to procure an order confirming the referee's report of sale does not invalidate the title of the purchaser at the sale who has paid the consideration and received the referee's deed. Peck v. Knickerbocker Ice Co., 18 Hun, 186; Fort v. Burch, 6 Barb. 76; Fuller v. Van Geesen, 4 Hill, 173. The fact that the mortgage covered both the realty and personalty belonging to the trust and was not filed, does not render it invalid as between the parties. Jones v. Graham, 77 N. Y. 628; Briggs v. Oliver, 68 N. Y. 336. The $49,000 bid at the sale was paid as follows: John Ward executed a bond for $25,000 principal, secured by a mortgage upon the interests which he had just acquired. There was a cash payment of $902.84 and the remainder, being for interest, which under the terms of the will belonged to Miss Partridge, was discharged by her acknowledgment of the receipt from Mr. Butler, as executor and trustee, of the sum of $23,156. On November 13, 1896, after the death of John Ward, William G. Ward conveyed and assigned to the defendants Maria E. G. McK. Ward and Caroline C. Ward "all the share or shares, estate, right, title and interest whatsoever which the said William G. Ward now hath or at any time hereafter shall or may have or in any wise become entitled to have and receive, of, in or to any or all of the estate and property of every name, nature and description whatsoever, and wheresoever situated, which belonged to Henry H. Ward." On the same day William G. Ward executed an assignment to the said defendants of his share in the personal property which belonged to John Ward. William G. Ward was appointed administrator of John's estate and, on April 18, 1898, he, individually, and as administrator, and Charles H. Ward, entered into an agreement with Miss Partridge by which her claim against John, amounting, with interest, to $45,275, was adjusted by conveying to her certain real and personal property previously belonging to John, she releasing his estate and William and Charles Ward from all claims which she had against any of them by reason of the indebtedness of John.

The clause of the will above quoted provides that the gift to William, Charles and John shall take effect upon the termination of such trust by the death of Miss Partridge and that the property to be disposed of shall be the capital of the trust as it exists at the date of such death. If, prior to this date, either William, Charles or John shall die leaving issue, such issue shall take in his place per stirpes. This provision is applicable to the defendants, William, their father, having died before Miss Partridge. So far as they are concerned the situation is precisely as it would have been had the will mentioned them by name. William could transfer his own interest in the estate, but whether the party receiving the transfer realized anything or not depended upon the contingency of William outliving Miss Partridge. He could not by transferring his interest deprive his daughters of their interest, which vested in them absolutely at the death of Miss Partridge, provided their father had died previously.

The will further provides that if, at the death of Miss Partridge, either William, Charles or John shall be dead, leaving no issue, the share of the deceased shall go to the survivor or survivors. It seems

plain, therefore, that neither of the cousins could touch a dollar of the estate until the trust was terminated by the death of the beneficiary. When that event took place, if all were living, each would take a third; if two were living each would take a half; and if but one survived he would take it all. As before stated, if nothing had occurred to disturb the status of the parties, the estate would have been divided equally; Charles taking one-half and the daughters of William one-half. But until the event occurred which made it possible to dispose of the residuary estate no vested interest was created but only an expectant contingent interest.

Was this interest alienable? The complainant insists that during the lifetime of Miss Partridge the disposition of the estate upon the termination of the trust was wholly conjectural, William, Charles and John having mere possibilities that they would acquire interests if they were living when Miss Partridge died. Their interests, it is said, were neither descendible, divisable nor alienable; they could not be mortgaged and hence no title passed by the foreclosure of the mortgage. The court is unable to accede to this view. There seems to be little controversy as to the proposition that the interests of the three cousins under the will were contingent remainders. By the statutes of New York estates, as respects the time of their enjoyment, are divided into estates in possession and estates in expectancy, the latter being subdivided into future estates and reversions. "A future estate is an estate limited to commence in possession at a future day, either without the intervention of a precedent estate, or on the determination, by lapse of time or otherwise, of a precedent estate created at the same time." A future estate dependent on a precedent estate, may be transferred by the name remainder. A future estate may be either vested or contingent. It is contingent when the person to whom or the event upon which it is limited to take effect remains uncertain. "Expectant estates are descendible, devisable and alienable, in the same manner as estates in possession." 1 Rev. St. N. Y. pp. 722–725, part 2, art. 1, c. 1, tit. 2. It may well be that the estate in question is not devisable for the reason that the event which makes the will operative—the death of the testator—defeats the estate. For the same reason it is not descendible; it remains an expectant estate only during the life of the beneficiary and, as such an estate, it cannot descend because the death of the intestate, before that of the beneficiary, terminates it. But why may it not be alienated? Such an estate has a tangible present value. It may be sold and property which may be sold may be mortgaged. Can there be any doubt, if the complainant had sold his interest for a valuable consideration, that the vendee would now be entitled to complainant's share? If he had mortgaged or pledged his interest would not the purchaser on foreclosure be entitled to the same right? The trust estate was in esse and the beneficiary was well advanced in years. The only risk the purchaser of such an interest would incur would be the chance that the beneficiary would outlive the remainderman. In the due course of nature this would be an unlikely event. Like a life policy the complainant's interest possessed an actual existing value. To hold that it was incapable of

disposition and worthless in the hands of the transferee seems to run counter to the progressive spirit of the law, the tendency of which is to limit the suspension of the power of alienation within as narrow bounds as possible.

In Ham v. Van Orden, 84 N. Y. 270, the interest of the property forming the substance of the legacy was to be paid to one Wessel during his life and upon his death without issue one-fourth to the plaintiff. The court says:

"In either case, she [the plaintiff] acquired an interest although the right to possession was postponed to a future period and depended upon the contingency of the death of Wessel without children. This did not prevent the creation of the estate, but rendered it liable to be defeated. It was an estate in expectancy, however, and could not be destroyed by any alienation or other act of Wessel or his trustee, and upon his death without children would become absolute in the plaintiff. It was therefore alienable by her to the same extent as if in possession, and whether it be deemed vested or contingent. These rules apply although the property involved is personal and not real."

In Hennessy v. Patterson, 85 N. Y. 91, 103, the court says:

"John Foley had something more than a mere possibility of acquiring an estate; he had the fixed, absolute right to have the estate if the contingency occurred. That right was conferred by the will of the testator, and vested in him at the instant of the latter's death. The devisee held it as a vested right, but such a right as the contingent and uncertain character of the devise created; nevertheless a fixed and vested right, which the Revised Statutes recognize as an estate, place in the category of expectant estates, and decree shall be descendible, and which, as we have already seen, was descendible even at common law. In his chapter on executory devises Washburn reminds us of the necessity of distinguishing 'between the vesting of a right to a future estate of freehold, the vesting of a freehold estate in interest, and the vesting of the same in possession.' "

See, also, Moore v. Littel, 41 N. Y. 66; Kelso v. Lorrillard, 85 N. Y. 177.

If the foregoing conclusions be correct the proposition that the title which passed to John by the foreclosure sale was defeated by his death cannot be maintained. If Charles had sold his interest to A, a total stranger, it seems obvious that A's death would not have extinguished his interest and reinvested the title in Charles. It is plain that the interest was one that descended to A's heirs and next of kin and, on the death of Miss Partridge, vested in them the share in the estate which Charles would have taken if he had not parted with it. The legal effect of the death of John without issue was to extinguish his own contingent interest in the trust estate, but not his title to the property purchased by him at the foreclosure—this, like any other property, was his to dispose of by conveyance or will as he saw fit, or by descent to his heirs and next of kin if undisposed of at his death.

The complainant contends further that even if John obtained title by virtue of the sale in foreclosure whatever title passed to him, and by descent from him to William and his daughters, was and is impressed with a trust in favor of the complainant. The entire transaction of the bond, the mortgages, the foreclosure and the sale seems inexplicable. If the amount bid at the sale had been paid in cash, the indebtedness to the trust discharged and the balance paid to Miss Partridge a sufficient reason would be disclosed. But

why so complicated and expensive a proceeding should have been carried through, the net result of which was to substitute the bond of John for the one of Charles and William it is difficult to understand. If Miss Partridge had given a receipt for past interest and a waiver of future interest before instead of after the foreclosure, it would seem that the result, so far as a benefit to the trust is concerned would have been the same. There must have been some good reason why she was unwilling to release Charles and William but willing to release John. The high character of the parties and the unquestioned professional standing of the counsel preclude the idea that there was anything unfair or questionable in the transaction. There must have been a reason and a good reason, but what that reason was the record fails to disclose. Mr. Butler died in 1897 and has left no word of explanation. In the absence of proof to the contrary it must be assumed that the transaction was a bona fide one. The court is not permitted to indulge in speculation as to the motive of the trustee or the object sought to be attained. It is suggested that Mr. Butler's intention was to preserve the trust for the benefit of the family by barring the claims of creditors. Several reasons are suggested against this explanation, one of which is that it was a most complex and inadequate remedy and one which would hardly have appealed to a lawyer of Mr. Butler's astuteness and ability. It is, however, enough to say that the suggestion is advanced simply as a "theory" and an "inference." If the acquisition of the title by John were a temporary arrangement merely it would seem that the complainant must have known it. Not only was there a failure to reduce such agreement to writing but there is no testimony from the complainant or any one else indicating that such was the intention. It is, indeed, strange that such elaborate machinery should have been set in motion to accomplish a definite purpose and no evidence left to establish that purpose. If the foreclosure had been undertaken for the advantage of William and Charles would the proceeding have terminated at a point distinctly prejudicial to their interests? Miss Partridge lived 15 years after the foreclosure, William 14 years, Mr. Butler 10 years and John 9 years, ample time, it would appear, in which to remove from the situation those elements of uncertainty which were sure to create confusion and, in all probability, work injustice to Charles. In other words, if a trust were intended there was every reason why its existence should have been made clear. The fact that no such proof is presented raises a strong presumption against the trust.

Again, the complainant's brief says:

"Another theory by which we reach the same result is that in making the purchase in this way John was acting as the agent of Butler; that in reality the purchase was made by Butler as trustee. This is the real fact."

The court is unable to accept this view. The real fact is that the purchase was made by John. The proceeding operated to vest in him, not in Mr. Butler, the interests of Charles and William. Why this was done we may not know; that it was done admits of no doubt; the burden is on him who asserts the contrary to prove his contention. If John were living to-day can there be a doubt, upon the

present facts, that his title to the interest of Charles would be valid? John's title to William's share was defeated by the latter's death, but Charles survived Miss Partridge, his interest in the trust became vested and absolute and the title would have passed to him had he not parted with it 15 years before. John's interest as purchaser at the foreclosure sale did not lapse but passed to his heirs and personal representatives.

The defendants Ward do not inherit through their father, but under the following language of the will of Henry:

"If, at such time of the termination of the trust, either of my said three cousins, William, Charles and John, shall be dead leaving issue who shall then be living, such issue shall take in his place, per stirpes and not per capita, absolutely, and in fee simple, the shares of the capital of such trust estate, which he would have taken if living."

These defendants assert title to half of the interest sold to John on foreclosure as assignees and grantees of their father, who was one of the heirs of John, Charles being the other heir. It is argued by the complainant that the defendants are estopped in pais and of record from claiming any title by descent from their father by reason of his action on the death of John. This contention is based first upon a letter written November 11, 1896, by counsel for William to counsel for Charles, which contains this expression of opinion upon the question of law involved:

"On careful examination of the terms of the will of Henry H. Ward, I am satisfied that there is fair ground for claiming that the interests of William G., Charles H. and John Ward in the residuary estate of Henry H. Ward were not vested. But at the same time it is certainly more prudent to take such precautions as may be to protect all interests in case they should be held to be vested."

This is treated "as a representation of William and his counsel that John had no interest in the estate of Henry." The court cannot think that it bears this construction. There is here no concealment of fact; it is rather a mere impression, expressed tentatively, upon a proposition of law. Although the writer of the letter is inclined to think that there is "a fair ground for claiming" that the interests of William and Charles did not pass to John his advice is to proceed upon the theory that they did so pass. Charles was represented by learned counsel and both knew all the facts. On the question of law there might well be a difference of opinion, but how Charles was misled or injured by the statements of the letter in question it is not easy to perceive. In June, 1897, an action was brought by Miss Partridge against Prescott Hall Butler, as executor of the will of Charles E. Butler, deceased, Charles H. Ward and others, praying that a suitable person be appointed trustee under the will of Henry H. Ward in the place of Butler and Charles, who is alleged to be in poor health and anxious to resign. It is said that this complaint alleges that Charles and William, by John's death, had become the persons entitled, if they survived, to John's share in the trust estate. This was true upon any view of the law, but it is said, because certain facts are not alleged that the complaint proceeds upon the theory that John took nothing by the foreclosure sale. There is here no element of an estoppel of record and the same is true of

the proceeding in the Surrogate's Court and in Smith v. Butler. During this entire controversy the facts upon which John Ward's title is based were as well known to one party as to the other, neither was misled, and the fact, if it be a fact, that counsel for complainant has changed his position as to the legal effect of the purchase by John is not material upon any of the issues involved.

In Brewster v. Striker, 2 N. Y. 41, it is said:

"But again, the alleged admission was not of a fact, but of a conclusion of law. The will itself, and the clauses it contains, are not, and never were, as matters of fact, in dispute; but the construction of those clauses, and the estate and interest taken by the devisees under them, upon which the controversy turns, are questions of law. The grandchildren, at the time of the partition, doubtless supposed the devise of the real estate to them to have the legal effect to vest in them the estate in equal shares, as tenants in common, in fee simple absolute, and on such erroneous supposition they acted in the partition they assumed to make. But could that mistake of the law be urged and used against either party, to estop him from afterwards claiming and asserting his rights under the true exposition of the will?"

This question was answered in the negative.

Every right which the complainant ever had to assert the invalidity of John's title he now possesses.

What has been said already disposes of the alleged agreement between counsel that William and Charles should not assert title through descent from John, but that they should take the position that their interests were not assignable and that the mortgages and foreclosure sale did not transfer the title to those interests. The burden is upon the complainant to establish this agreement and it cannot be said that this has been done in the face of the denial by counsel for defendants that such an agreement was made.

The court has looked in vain through the family history and the complicated transactions of the firm of Ward & Co. for a solution of this controversy. The relations between the brothers seem to have been of the most cordial and friendly nature and each seems to have been willing to make personal sacrifices to sustain the honor and business reputation of the family. Not only was this true of the brothers, but other members of the family seem to have been actuated by the same spirit until this unfortunate misunderstanding arose.

It is not thought necessary to decide, even were it possible to do so, who was responsible for the failure of the firm and the disasters which followed. The situation is so complicated, the meager accounts presented so inconsequential, the interests of the parties so complex—with rights crossing, recrossing, combining and separating at every stage—that it is impossible to draw any satisfactory deduction therefrom adverse to the conclusion which the law attributes to the undisputed acts of the parties.

The authorities cited in the defendants' brief seem to establish conclusively the proposition that the wife of Charles had no dower right in the property covered by the mortgage to Butler. Durando v. Durando, 23 N. Y. 331; House v. Jackson, 50 N. Y. 165; Clark v. Clark, 84 Hun, 362, 32 N. Y. Supp. 325.

There can be no impropriety in saying that the court entered upon the examination of this cause with the hope that a conclusion might

be reached which would permit the distribution of the estate in question according to the intention of the testator. But the obstacle in the path of such a result was the act of the complainant himself in transferring the title upon which his rights depended. Were all the parties to this transfer alive it might, perhaps, be explained in accordance with the theories which are now advanced; but the court has been compelled to the conclusion that the deliberate and solemn act by which Charles parted with his title cannot be overthrown by mere inference and presumption.

It follows that the defendants are entitled to a decree substantially as stated at the conclusion of their main brief.

It would seem that a settlement of the amount in the hands of the trustee might be reached by agreement, but if this should prove impossible a master will be appointed to pass the account.