## HENDLER v. UNITED STATES.

### No. 5419.

District Court, D. Maryland.
Dec. 30, 1936.

Apart from the literal meaning of the section, the assumption of liabilities in this case was not within the substantial import of the statute. In financial substance Hendler merely exchanged its equity in its property for shares of stock in the Borden Company which represented only the equity therein, and which *pro tanto* were diminished in value by the Hendler liabilities assumed by Borden. Neither in form nor substance did Hendler receive any "other property or money" by Borden's assumption of Hendler's liabilities.

Counsel for the Government also contends the item of $534,297.40, even if not taxable merely because an assumed liability, is nevertheless taxable in this particular case, by virtue of the special provisions of the reorganization agreement with respect to the bonded debt of the Hendler Company. This requires a more detailed reference thereto than has heretofore been made. There was an informal written agreement between Borden and Hendler in offer and acceptance form by letter dated April 16, 1929, which contemplated exchange of all the property of Hendler and its three wholly owned subsidiaries for certain cash and stock of Borden, subject to all liabilities with minor exceptions. No definite closing date was therein provided, but evidently it was contemplated it might be later than July 1, 1929, because it was stipulated that Hendler should call its bonds for redemption on July 1, 1929, and borrow the money to pay them, to be included in its debts taken over by Borden. A more formal contract was executed on May 21, 1929, whereby in paragraph II (C) Borden did "assume and agree to pay all indebtedness and liabilities whatsoever of your Company and of the said subsidiary companies as the same shall exist at closing of title to us hereunder," with certain exceptions. "Closing of title" was defined as the date that Borden received title to the property, except as to income tax accounting which (by paragraph V) was fixed as of April 1, 1929. June 21, 1929, was fixed as the closing date, subject to adjournment to a later date if reasonably necessary. Again it was stipulated that Hendler should call its bonds for redemption on July 1, 1929, and could borrow the money to pay therefor and include the same in its debts assumed by Borden. Paragraph III(F). Hendler did call its bonds as stipulated; did *not* borrow any money to pay them; the properties were actually deeded over to Borden on June 21, 1929, and the cash and stock then delivered to Hendler. Bonds were then outstanding to the par value of $501,000, including $7,000 held in the treasury of Hendler. In May and June Borden bought in the market and elsewhere $149,000 of the bonds at a cost of $153,072.40, and about July 1, surrendered them with the $7,000 treasury bonds, to the trustee for cancellation, and also paid the trustee on June 27, $381,225 for redemption of the remaining $345,000 bonds, at par, interest and premium. The trustee then satis-

fied the mortgage by appropriate instrument.

On these facts the Government contends the cost to Borden of satisfying the bonded indebtedness, $534,297.40, was "money constructively received" by Hendler and not distributed to stockholders, and therefore taxable, being less than the real "gain" to Hendler, at then prevailing market prices. Special reference is made to the contract provision (IIIB), "at or prior to the closing of title to us the said mortgage will be satisfied as provided by section 3 of Article IV thereof, and we shall be furnished with a satisfaction piece at the closing." But it must be remembered that the contract also provided that Hendler could borrow the money to redeem the bonds and include the amount in the liabilities to be assumed. In closing the transaction before July 1, 1929, before the bonds were redeemable, and while they were still outstanding, Borden waived the requirement for satisfaction of the mortgage at the closing date and took the property subject to the bond issue, which then became one of the liabilities of Hendler assumed at the closing by Borden, just as it assumed the bank loans and current accounts payable; and Borden itself paid all of them within a month thereafter. None of the money that paid these debts was ever received or distributed by Hendler. It is apparent from the whole of the contract that Borden took the property subject to the liability of the cost of redeeming the bonds, and the corporate resolutions of both Hendler and Borden also show this was the clear intention of the parties. If the closing date had actually been after July 1st, the bonds would have been retired but the liabilities assumed by Borden increased by the cost thereof. In closing before July 1st, Borden took the property subject to the bonds, without the added cost of retirement in Hendler liabilities, but with the obligation on Borden to directly defray the cost. In the deed of June 21, 1929, from Hendler to Borden, the latter expressly assumed and agreed to pay "all the indebtedness and liabilities whatsoever" of Hendler then existing, which of course included the outstanding bonds, which had been called for redemption July 1st following.

What the Government specifically urges is that Borden's payment of the bonds was a payment made for Hendler and therefore a constructive receipt and disbursement of the money for its own account and in payment of its own debt. But this was not the case. As between Borden and Hendler the debt was then Borden's and not Hendler's, by virtue of the contract and what was done by the parties. In closing before July 1, 1929, with the bonds outstanding Borden assumed them by the express provisions of the contract and the deed. Likewise it waived the stipulation for its benefit as to the satisfaction of the bonds before closing, but thereby did not increase at all the cost to itself of the whole transaction. If Borden had not waived the "satisfaction piece," then the money to satisfy the bonds would have been borrowed by Hendler, and would have furnished no basis for the particular contention now advanced. The cost of the bond redemption was not taxable by the contract as worded or as executed. If there were any difference, the latter would prevail as to taxability. United States v. Phellis, 257 U.S. 156, 172, 42 S.Ct. 63, 66, 66 L.Ed. 180; American Security & Trust Co. v. Tait, 5 F.Supp. 337, 341 (D.C.Md.). But the item cannot properly be made taxable by a strained construction of the transaction resulting from a combination of both what the contract provided and what the parties actually did, when it is not taxable on either basis separately considered. The really important question here is whether the payment when made by Borden was for its own account, in its relation to Hendler, or for the latter's account. Clearly it was the former.

The time of payment, only a few days after the closing, is stressed as indicating that it was Hendler's debt that was being paid by Borden. But that is quite immaterial in the case of the bonds as in the case of the other liabilities. The defendant's counsel cites Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918; United States v. Boston & Maine R.R., 279 U.S. 732, 49 S. Ct. 505, 73 L.Ed. 929; and United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131, to show that there may be a constructive receipt of ordinary income for tax purposes, but we are not dealing here with what constitutes ordinary income, but with the construction of "other property or money" in this particular section of the law. Counsel for the Government also rely upon the case of The Liquidating Company v. Commissioner of Internal Revenue, 33 B.T.A. 1173, in sup-

port of their contention. In many respects the reorganization there was like that here, but on the precise point here involved there was a material difference which makes the case distinguishable. The Liquidating Company was a Delaware corporation formerly called Standard Creameries, Inc., engaged in business in California. Its properties were acquired in 1929 by the Borden Company pursuant to a plan of reorganization in general outline very similar to the contract in this case; but it differed in an important formal respect with regard to the provision for the payment of the outstanding bond issue of the Liquidating Company. Its bonds were convertible into common stock, and at the time of making the agreement the conversion privilege had not expired. The amount of the bonds that would be outstanding at the time of settlement was, therefore, not known, and in the reorganization agreement Borden did not assume the payment of the outstanding bonds together with the other liabilities, but in a separate clause of the contract it agreed to "provide the funds necessary for the redemption on September 1, 1929, of your said $1,298,000 of ten-year 6½% Convertible Debenture Bonds, or so many thereof as shall not before that time be converted into common stock of your Company." Pursuant to the agreement Borden deposited with the trustee in the trust indenture securing the bonds funds sufficient to redeem them. The Board, after pointing out that Borden had not assumed the payment of the bonds with other liabilities, held that the money paid by Borden to the trustee was cash received by The Liquidating Company and taxable because not distributed to stockholders. That case, therefore, differs from the present in the important respect (at least so far as form is concerned) that Borden did not assume the payment of the bonds as its own obligation but agreed to furnish the funds to redeem the bonds.

The importance of the form of the transaction as affecting tax liability in such cases, in the opinion of the Board of Tax Appeals, appears from the case of the Minnesota Tea Company v. Commissioner, 34 B.T.A. 145, decided by the Board shortly after the case of The Liquidating Company, with which it may be contrasted. The Minnesota Tea Company, pursuant to a plan of reorganization, transferred its assets to another corporation in exchange for voting trust common stock and $426,842.52 in money. It retained the stock but immediately distributed the money among its stockholders who, however, agreed to and did pay liabilities of the Tea Company in the amount of $106,472.72. In this case it will be noted that the other corporation did not assume the liabilities of the Tea Company but acquired the property free of debts which had to be discharged by the Tea Company. Nevertheless the Board held that as all the money received by the Tea Company was first distributed to stockholders, who then paid the liabilities, there was no taxable feature in the transaction. It declined to hold that there was a *constructive* distribution of the money by the corporation to its creditors, which made the $106,472.72 taxable under the ruling in the case of The Liquidating Co. v. Com'r, supra. Here again obviously the form was treated as controlling. And if the form is sufficient to control the decision there would seem to be even less reason in the instant case for holding the transaction taxable than in the Tea Company Case; and also sufficient to distinguish the case of The Liquidating Company v. Com'r, as decided by the Board.

There is another difficulty in the position of the defendant in this case. In addition to showing that the money for the redemption of the bonds was received by the corporation, it must also show that it was not distributed *in pursuance of the plan of reorganization*. On this point the position taken by the defendant is that the only distribution within the statute is a distribution *to stockholders;* and therefore a distribution to creditors, even though required by the plan of reorganization, subjects the money so paid to taxation. In support of its position the defendant relies on the case of The Liquidating Company v. Com'r, supra, where the Board of Tax Appeals did so hold. That decision seems to have been based principally on West Texas Ref. & Dev. Co. v. Commissioner, 68 F.(2d) 77, 80 (C.C.A. 10), where it was briefly stated that, in a reorganization, money received by a corporation which is used to pay debts and not distributed to stockholders is taxable as otherwise a realized gain would escape taxation. The matter was not further discussed probably in view of the fact that on the main point of the case the transaction was held not a reorganization but a sale. The decision was in 1933, prior to the above mentioned decisions of the Su-

preme Court applying the reorganization statute. The same question was noted but not decided, on the first appeal from the Board in the Minnesota Tea Company Case, 76 F.(2d) 797, 799, 803 (C.C.A.8), affirmed 296 U.S. 378, 56 S.Ct. 269, 80 L. Ed. 284. The case was remanded to the Board for determination of the point on the merits, and the Board then decided that the money used to pay debts was not taxable because it had first been distributed to the stockholders by whom the debts were paid. The decision was thus made to depend upon the mere form of the particular transaction. The practical importance of taxation in corporate reorganizations warrants more extended consideration of the question of whether money received and distributed or disbursed by a corporation in payment of debts as required by the plan of reorganization, is taxable under the statute. [1]

[4] Two thoughts are clearly expressed in section 112(d). One is that money or property received by the corporation and distributed in pursuance of the plan is not taxable to the corporation; the other is that money or other property so received and not so distributed, is taxable. Here the antithesis seems to be on distribution or retention by the corporation, and not distribution to stockholders or creditors. A third situation (the one with which we are here dealing) must be determined by a construction of the word "distribute" as used in the statute. Does it necessarily cover only a distribution *to* *stockholders?* The statute does not so say

and the construction contended for by the defendant reads into the statute words ("to the stockholders") which do not expressly appear therein; and in so doing reads out of the statute (or at least gives little significance to) the phrase "in pursuance of the plan of reorganization." The construction must be within and not without the words of the statute, and should if possible be consistent with the purpose of the enactment. Its legislative history is extensively reviewed in Mead Coal Co. v. Commissioner, 72 F.(2d) 22, 27 (C.C.A.4); Minnesota Tea Co. v. Commissioner, 34 B. T.A. 145, and Baar & Morris, Hidden Taxes in Corporate Reorganizations, p. 244. It is, I think, apparent with reasonable clarity therefrom that the fundamental purpose of Congress was to remove from ordinary business transactions, in the nature of corporate mergers or reorganizations, the burden of heavy taxation on mere paper profits, and also to shift the ultimate incidence of taxation from the corporation to its stockholders where the corporate gain is distributed to them to be paid by them when actually realized.

In corporate mergers and reorganizations the assumption of liabilities and the payment of debts is a very usual feature. The principal purpose of the financial negotiations preceding the contract is to reach an agreement as to the price to be paid for the *net* value of the assets to be transferred. When price and terms have been agreed upon it is largely a matter of legal detail as to the method of paying the debts. The contract of reorganiza-

[1] In the earlier case of National Pipe & Foundry Co. v. Commissioner, 19 B.T. A. 242, a corporate reorganization was held not taxable although a large sum had been received by the corporation and applied in payment of debts as required by the plan; but there was no discussion of the particular point. In Montgomery's Federal Income Tax Hand Book (1935–36) page 202, in discussing the meaning of distribution as used in the statute, the author says: "In Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428, all the cash was used to pay creditors. The corporation was held to be taxable on other grounds but no question was made regarding the payment to creditors being a distribution. In the author's opinion a distribution to bondholders or general creditors should be considered a distribution under section 112(d) if it is part of the reorganization plan. Very frequent-

ly, a reorganization can be effected in no other way."

See also Baar & Morris, Hidden Taxes in Corporate Reorganizations, p. 264, § 15, where, after discussion of this particular subject and a review of the National Pipe & Foundry Company case, the authors say: "Such a case is no different in any substantial respect from that in which the corporation 'acts merely as a conduit in passing the proceeds of sale on to its stockholders' the result being the same as the acquisition of all the stock, followed by liquidation. It would therefore appear to be consistent with the legislative purpose, as explained in the 'Statement of the Changes made in the Revenue Act of 1921 by the Treasury Draft and the Reasons Therefor,' quoted above (at sec. 4) and in the substantially identical reports of the House and Senate Committees, that no gain of the transferor corporation should be recognized in such a case."

tion may provide for this in any one of several ways: (1) the transferee may pay the transferor only the *net* worth of the assets, and assume the liabilities; or (2) the transferor, before the actual transfer, may apply the quick assets to extinguish the current liabilities, or (as in this case) convert funded into current liabilities by optional call for redemption and borrow the money to pay them; or (3) the transferee may pay to the transferor the gross value of the assets, but require the liabilities to be paid by the latter from the fund. The financial result to the transferor is exactly the same in all three cases. In (2) it is clear that the money used to pay the debts would not be taxable on any theory. In (1) it is also not taxable unless it is to be held that an assumption of liabilities itself makes the transaction taxable; but for the reasons already given, I have concluded that it does · not. And there would seem to be no substantial reason for holding the transaction taxable in (3), the other case. To so hold would allow the mere form of the transaction· to overcome the substance when clearly income taxability should be determined, within the statutory wording, by substance rather than form. United States v. Phellis, 257 U.S. 156, 42 S.Ct. 63, 66 L.Ed. 180; Starr v. Commissioner, 82 F.(2d) 964, 968 (C.C.A.4). If form alone is to be made the basis of decision as to taxability, the practical futility of reading into the statute the phrase, "to the stockholders" would appear from the Minnesota Tea Company Case where the Board of Tax Appeals held that taxability was avoided by distributing the money to the stockholders with their agreement to pay the debts.

There is no lexicological difficulty involved in including creditors within the scope of "distribute" as used in the section under consideration. It might possibly be considered inapt to use the word if the distribution were limited to creditors only, because "distribute to creditors" is such a familiar phrase in bankruptcy and insolvency, where it most often implies something less than payment in full. But there is no linguistic infelicity in the phrase "distribute in pursuance of the plan of reorganization *among creditors and stockholders*," because what is implied is a division of the whole fund between two classes, in accordance with their respective rights. Indeed it would be difficult to select a more appropriate word than "distribute" in this connection. Cf. Baar & Morris, Hidden Taxes in Corporate Reorganizations, supra, p. 266.

Counsel for the defendant points out that in other related sections of the statute (112(g) and 115, 26 U.S.C.A. §§ 112 note, 115 and note) Congress has expressly limited "distribution" as there used to stockholders; but this sign post for construction at best points two ways, because in those sections the words "to stockholders" were imperatively required by the subject matter, which related to the taxation of the individual stockholders, while the section now being considered (112(d)) relates to the corporation itself, as distinct from its stockholders, and in this connection the word distribute was not followed by the words "to. stockholders." By contrast its omission in this ·section may be regarded as significant. Of course, to be non-taxable, the money must have been distributed in accordance with the plan of reorganization. We are not considering a situation where money is received and retained by a corporation for its general corporate purposes.

The point has been discussed so far largely from the standpoint of the literal import of the wording of the statute, as its application to the facts of the case must of course be not inconsistent with its language; but if the latter is considered sufficiently open to permit or require construction, then the basis of the decision should be the intent of the Act to be gathered from its provisions as a whole and as disclosed in its legislative history. As already indicated the central thought was to remove from ordinary business transactions the deterrent influence of immediate and possibly onerous taxation on merely paper profits. Obviously taxation to the corporation of money received by it and disbursed in payment of debts, as required by the plan of reorganization, would tend to frustrate this intent of the statute. It seems not a sufficient answer to say that in such case the tax must be imposed, otherwise a gain will escape taxation. The net gain to the corporation is not marked by money paid by it to creditors but by what it retains, or distributes to stockholders, and in the latter case they become ultimately liable to proper taxation on actually realized gain. As to this the evident thought of the statute was to postpone, rather than to exempt from, taxation. It is conceivable, of course, that the amount of the taxes, as finally realized by the Gov-

ernment, by such postponement, from the reorganization as the proximate cause, may be less, by the operation of the complex provisions of our income tax system, corporate and individual, than it would have been if the tax on the gain had been levied on the corporation, but this circumstance was entirely within the field of congressional power, and should not be allowed to impair the free operation of the statute to accomplish its major objective. Helvering v. Bliss, 293 U.S. 144, 151, 55 S.Ct. 17, 20, 79 L.Ed. 246, 97 A.L.R. 207. In this connection it is not inappropriate to note that by section 112(e), 26 U.S.C.A. § 112(e) and note, the corporation is not allowed to take credit in tax accounting for a loss in such case resulting from a reorganization. See Mead Coal Co. v. Commissioner, 72 F.(2d) 22, 28 (C.C.A.4).

I conclude, therefore, that money received by the corporation and applied in pursuance of the plan of reorganization to the payment of debts is not to be treated as a taxable gain to the corporation. But finally on this point it is to be observed that this is really not the crucial point in this particular case, because neither in form nor in substance, did Hendler receive any money or property which was not distributed to stockholders. As to form, the money used to pay the bonded debt was never actually received or distributed, or retained by the corporation; and as to substance, all that Hendler received in the transaction (other than a comparatively small amount of cash distributed to preferred stockholders) was common stock of Borden, representing the equity in its property, in exchange for the equity in Hendler property. The item of $534,297.40 was not taxable.

*As to estoppel:* The Government sets up an estoppel against the plaintiff. The circumstances on which this is based have already been stated. In the Hendler tax return for 1929 deduction was claimed for bond discount and premium which, if properly allowed, reduced the tax in the amount of $6,260.33. The Field Agent first disallowed the deduction but later, in consequence of a protest from the taxpayer, followed by a conference with tax counsel, the deductions were approved, and the tax so determined was paid. Later the Commissioner made the much larger deficiency assessment on the basis, partially at least, of the position taken by the taxpayer at that time as to the effect of the reorganization agreement. But the circumstances do not constitute an estoppel. There was no misrepresentation of fact, as all of the facts were fully and equally known to both the parties. What was advanced by the taxpayer's representative was merely a matter of opinion as to the application of the income tax law under admitted facts. The argument then stressed by the taxpayer seems to have been in substance that for the purpose of the income tax accounting of the taxpayer, the effect of the reorganization should be disregarded with respect to the bond redemption because the bonds continued to be the obligation of the taxpayer until actually redeemed. This was undeniably true as between Hendler and its bondholders, but not as between Hendler and Borden. The question as to what was the effect of the legal situation respecting the bonds as influencing the income tax return was clearly only a matter of opinion on the question of law and cannot properly be made the basis of an estoppel United States v. Scott & Sons, 69 F.(2d) 728, 732 (C.C.A.1); Ward v. Ward (C. C.) 131 F. 946, 953, affirmed (C.C.A.) 145 F. 1023; Marshall v. Security Co., 155 Md. 649, 653, 142 A. 186; 21 C.J. 1142, 1147. Furthermore, the Government has sustained no prejudice as a result of the taxpayer's contention because, if it was unsound, the tax saving by virtue of the allowance of bond discount and premiums as deductions can now be recouped by the defendant, even though the time has expired for a deficiency assessment for the particular item. Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293. The kind of estoppel here set up, known as equitable estoppel, or estoppel in pais, is a principle of equity, justice and good conscience; and it would be manifestly inequitable to apply that principle here. At the time the argument was advanced by the taxpayer, it related to a particular situation or phase of income tax accounting and neither party then had in view the different principle, subsequently applied by the Commissioner in imposing the very much larger deficiency tax. Estoppel in pais is a valuable shield for defense, but it may not properly be converted into a powerful sword for attack. The situations in Swartz v. Commissioner (C.C.A.) 69 F.(2d) 633, and Stevens Mfg. Co. v. United States (Ct.Cl.) 8 F.Supp. 720, were quite different from that here.

*Third:* The taxpayer's contention just referred to was, in my opinion, unsound and the position first taken by the Field Agent in disallowing the deductions for bond discount and premiums was correct. Although the reorganization did not itself directly then impose a tax on Hendler, it had the necessary incidental effect of relieving Hendler entirely from liability on the bond issue which was paid by Borden. Clearly Hendler could not reduce its proper tax for the current year by the amount of a bond premium which it had never paid. And as bond discount is merely an increased interest rate on bonds it follows that proper credit therefor necessarily disappeared when the obligation on the principal of the bonds itself was removed from Hendler's liabilities. Western Maryland R. Co. v. Commissioner, 33 F. (2d) 695 (C.C.A.4). The defendant is therefore entitled to a deduction in the amount of $6,260.33 from the principal amount claimed by the plaintiff.

The final result is that the plaintiff is entitled to recover the amount sued for by it, $69,554.69, with interest thereon from date of payment, less $6,260.33, with interest thereon from the date the same was payable. Counsel should agree upon this date and submit for approval the special form of verdict in this case, as required by Judicial Code § 177, as amended June 22, 1936 (49 Stat. 1746, 28 U.S.C.A. § 284), on which judgment in the same form will be entered by the clerk in due course.

The parties have submitted a number of separate written requests for instructions which I have marked "granted" or "refused" respectively consistent with the conclusions herein, with exceptions noted for each of the parties as to each adverse ruling. It has not been necessary to rule on all the prayers submitted by the plaintiff. Many of them would have to be refused because while correctly stating a major proposition, they contain minor defects, or improper final conclusions.

This opinion is adopted as the findings of fact and conclusions required by the applicable statute. 28 U.S.C.A. § 764; Atkinson v. United States (C.C.A.) 73 F. (2d) 214; United States v. Tinsley, 68 F. 433 (C.C.A.4). As the controversy in the case is over questions of law, and there is no dispute as to the facts, it is not deemed necessary to make more formal or specific findings of fact than are recited in the opinion, but if either of the parties desires them, they may be submitted for consideration.