DONALD D. FOCHT, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7807–73. Filed May 24, 1977.

Donald D. Focht, pro se.
*Lowell F. Raeder*, for the respondent.

STERRETT, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the calendar year 1970 in the amount of $22,699.

The issues presented for decision are: (1) Whether gain is recognized under section 357(c), I.R.C. 1954, upon the transfer by petitioner, in 1970, of the assets and liabilities of his sole proprietorship to his controlled corporation; (2) whether petitioner failed to include, for his 1970 taxable year, $2,094 of receipts as rental income; and (3) whether petitioner is entitled to various deductions in excess of the amounts allowed by respondent.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner Donald D. Focht resided in Bethlehem, Pa., at the time the petition herein was filed. Prior to December 23, 1969, petitioner owned and operated a plumbing and heating service under the name of Don Focht Plumbing & Heating. This business was conducted as a sole proprietorship (the proprietorship) and operated on the cash receipts and disbursements method of accounting. On December 23, 1969, Don Focht Plumbing & Heating, Inc. (the corporation), was incorporated under the laws of the Commonwealth of Pennsylvania. During the taxable year 1970 petitioner transferred to Don Focht Plumbing & Heating, Inc., all of the assets of the sole proprietorship in exchange for all of the stock of the corporation,[1] plus the assumption by the

---

[1] One thousand shares of common stock, par value $10 per share.

corporation of all of the liabilities of the sole proprietorship. The primary reason for the incorporation of the business was to provide petitioner with limited liability against future business hazards.

The assets transferred to, petitioner's adjusted basis therein, and the liabilities assumed by the corporation are as follows:

| Assets | | | Adjusted basis |
|---|---|---|---|
| Accounts receivable | | $42,237.10 | 0 |
| Cash | | 959.00 | $959 |
| Inventory | | 18,320.00 | 18,320 |
| Fixed assets: | | | |
| Cost of assets | $39,741 | | |
| Less accelerated depreciation as of 12/31/69 | 23,553 | 16,188.00 | 16,188 |
| | | 77,704.10 | [2]35,467 |

| Liabilities | |
|---|---|
| Liabilities assumed by the corporation: | |
| Accounts payable | $73,729.00 |
| Salaries and wages paid by the corporation | 1,746.00 |
| Federal income taxes payable on payroll return | 8,168.00 |
| Property subject to liabilities which were transferred to the corporation: | |
| Truck (Clark Sandt) | 1,857.00 |
| Auto loan (Merchant's National Bank) | 3,479.00 |
| Total liabilities assumed by the corporation | 88,979.00 |

Therefore, the sum of the liabilities assumed by the corporation exceeded the total adjusted basis of the proprietorship's assets transferred to the corporation by $53,512. For his taxable year ended December 31, 1970, petitioner did not report any gain pursuant to the aforementioned exchange. Respondent, in his notice of deficiency dated July 27, 1973, determined that the petitioner recognized an ordinary gain in 1970 of $53,512 under section 357(c), such amount representing the excess of liabilities assumed over the adjusted basis of the assets transferred.

---

[2] The record does not indicate the fair market value of the assets, although the Court specifically raised the point.

On his 1970 return, petitioner reported gross rental income[3] of $16,694.25. Gross receipts for the year, per petitioner's rental receipt book, total $19,873.25 of which petitioner paid, to himself, $1,200. The receipts indicate petitioner's payments were for rent on apartment 5, 506 W. 3d Street, petitioner's address on his 1970 return. The statutory notice increased petitioner's rental income by $2,094. We find the correct computation of unreported rental income to be $1,979 arrived at as follows:

$19,873.25-$16,694.25-$1,200=[4]$1,979

Petitioner took various deductions on his 1970 return which have been disallowed, in part, by respondent as follows:

| Deduction | Amount claimed | Disallowed[5] |
|---|---|---|
| Auto expense | $2,098.01 | $497 |
| Legal expense | 589.63 | 330 |
| Insurance expense | 1,503.00 | 703 |
| Interest expense | 4,547.67 | 705 |
| Open house and show expense | 910.00 | 422 |
| Depreciation | 2,150.00 | 2,150 |

OPINION

The primary issue for our consideration is whether the transfer of the assets and liabilities of petitioner's sole proprietorship to his wholly owned corporation constituted a taxable exchange under section 357(c).[6] We have heretofore

---

[3] The rental properties were individually owned by petitioner.

[4] Note, respondent does not argue that petitioner be taxed when transferring money from his one hand to the other.

[5] Respondent's explanation of these adjustments in his notice of deficiency was as follows: (1) The auto expense was a personal expenditure; (2) the legal expense, a capital expenditure; (3) the insurance, interest, and open house expenses were all disallowed for lack of substantiation; and (4) the proprietorship's depreciation expense was disallowed because its assets had been transferred to the corporation in January 1970.

[6] SEC. 357(c). LIABILITIES IN EXCESS OF BASIS.—
(1) IN GENERAL.—In the case of an exchange—
(A) to which section 351 applies, or
(B) to which section 361 applies by reason of a plan of reorganization within the meaning of section 368(a)(1)(D),
if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.

held, in a multitude of cases, that the term "liabilities" as used in section 357 should be given an all-inclusive meaning. These holdings have required an extremely literal interpretation of the statute and the adoption of a mechanical test. *Raich v. Commissioner*, 46 T.C. 604 (1966); *Thatcher v. Commissioner*, 61 T.C. 28 (1973), revd. in part and affd. in part 533 F.2d 1114 (9th Cir. 1976).

In *Raich v. Commissioner, supra*, we held that the sum of the liabilities assumed, including the accounts payable, by the corporation exceeded the basis of the assets transferred because of our conclusion that trade account receivables of the cash basis petitioners/transferors had a basis of zero.[7] This reasoning is now generally accepted. See *Thatcher v. Commissioner*, 61 T.C. at 36.

We have always recognized that our all-inclusive definition of the term "liabilities" and the mechanical application of section 357(c), while defensible literally, produce a harsh result that does not appear to be in conformity with the overall purposes of sections 351 and 357(a).[8] However, in the past, we have been unable to find a satisfactory rationale for giving the term "liabilities" a more limited meaning. *Thatcher v. Commissioner*, 61 T.C. at 37; *Rosen v. Commissioner*, 62 T.C. 11, 19 (1974), affd. without opinion 515 F.2d 507 (3d Cir. 1975). Now two Circuit Courts of Appeals have indicated their dissatisfaction with our strict construction. Prior to the trial of this case, the Second Circuit reversed a Memorandum Opinion of this Court in *Bongiovanni v. Commissioner*, 470 F.2d 921 (2d Cir. 1972); and subsequent to

---

[7] The adjusted basis of the property transferred, excluding trade accounts receivable, was $11,251.73; liabilities transferred were trade accounts payable of $37,719.78 and notes payable of $8,273.03. Therefore, petitioner was held to have a recognized gain of $34,741.08.

[8] SEC. 357(a). GENERAL RULE.—Except as provided in subsections (b) and (c), if—

(1) the taxpayer receives property which would be permitted to be received under section 351, 361, 371, or 374 without the recognition of gain if it were the sole consideration, and

(2) as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or acquires from the taxpayer property subject to a liability,

then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351, 361, 371, or 374, as the case may be.

trial, the Court of Appeals for the Ninth Circuit reversed our decision in *Thatcher v. Commissioner, supra.*[9]

The Second Circuit believed that the legislative history[10] of section 357(c) amply justified the giving of a more restrictive definition to the word "liability." Thus, it said:

It was not meant to be synonymous with the strictly accounting liabilities involved in the case at bar. Section 357(c) was meant to apply to what might be called "tax" liabilities, i.e., liens in excess of tax costs, particularly mortgages encumbering property transferred in a Section 351 transaction. Any other construction results in an absurdity in the case of a cash basis taxpayer whose trade accounts payable are not recognized as a deduction (because he is on the cash basis) but whose "liabilities" (although unpaid) *are* recognized for purposes of Section 357(c). The payables of a cash basis taxpayer are "liabilities" for *accounting* purposes but should not be considered "liabilities" for *tax* purposes under Section 357(c) until they are paid. [*Bongiovanni v. Commissioner, supra* at 924. Citations omitted.]

The Ninth Circuit's decision in *Thatcher v. Commissioner, supra,* commended the *Bongiovanni* result but was uncomfortable with the method utilized in reaching such result.

There the court defined liabilities in an *ad hoc* manner that may have worked equity in that case, but the definition is likely to produce unforeseen results in other cases. * * *

In attempting to retain the ordinary meaning of liability "while giving vitality to the purposes of both section 351 (tax-free exchange) and section 357 (closing the escape of taxes by borrowing against assets before transferring them to the new corporation, and blocking the creation of a 'negative' basis)," the appellate court adopted Judge Hall's dissenting theory in *Thatcher v. Commissioner, supra,* to wit: a setoff of deductible trade accounts payable against trade accounts receivable, up to the lesser of the trade accounts payable or the gain recognized under section 357(c).

---

[9] Petitioner testified that a significant reason for litigating his case was the Second Circuit's reversal in *Bongiovanni*. Nonetheless petitioner, pro se before this Court, has not favored us with a written brief.

[10] Both the House and Senate committee reports illustrate an example of the application of sec. 357(c) wherein a mortgage incumbering land in an amount exceeding the land's basis is transferred pursuant to sec. 351. S. Rept. No. 1622, to accompany H. R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 270 (1954); H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. A129 (1954). Moreover, sec. 1.357–2(a), Income Tax Regs., contains a similar example.

The statutory purpose is far better served if payables paid by the transferee in the taxable year of transfer are treated as deductible to the transferor to the extent the offsetting receivables are treated as received by him. Since payment of a deductible liability by a cash method taxpayer gives rise to a deduction, the same deduction should be allowed on payment when section 357(c) treats the liability as assumed in exchange for receivables. [61 T.C. at 42–43, Hall, *J.*, dissenting.]

Our steadfast position has divided this Court[11] and produced reams of commentary from the tax bar.[12] As previously stated two appellate circuit courts disagreed with our harsh result and in differing manners have prevented taxation of something that was not in fact economic gain to a cash basis taxpayer. It is time for us to reconsider. We now hold that it is inappropriate to treat an assumed liability[13] of a cash method taxpayer as income to him and simultaneously to deny him a tax benefit, if the obligation would have been deductible upon his payment, for the satisfaction of that debt. Congressional intent, under sections 357 and 358(d), was to affect only those liabilities that, if assumed by a transferee corporation in a tax-free exchange, would cause gain recognition. An obligation should not be treated as a liability, under sections 357 and 358, to the extent that its payment would have been deductible if made by the transferor. To the extent that this position is inconsistent with our prior case law (*Raich v. Commissioner, supra,* et al.), we will no longer follow those decisions.

Prior to setting forth the rationale for our holding, we must clear a procedural hurdle—our *Golsen* rule. *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. on the substantive issue 445 F.2d 985 (10th Cir. 1971). Appeal in the instant case lies to the

---

[11] There were five dissenters in *Thatcher v. Commissioner, supra.*

[12] In view of our holding *infra,* see particularly: Kahn & Oesterle, "A Definition of 'Liabilities' in Internal Revenue Code Sections 357 and 358(d)," 73 Mich. L. Rev. 461 (1975).

See also: Burke & Chisolm, "Sec. 357: A Hidden Trap in Tax-Free Incorporations," 25 Tax L. Rev. 211 (1970); Del Cotto, "Sec. 357(c): Some Observations of Tax Effects to the Cash Basis Transferor," 24 Buffalo L. Rev. 1 (1974); Phelan, "Conflicting Definitions of 'Liabilities' Threatens Some Tax-Free Reorganizations," 40 J. Taxation 356 (1974); Roha, "Application of Section 357(c) of the Internal Revenue Code to a Section 351 Transfer of Accounts Receivable and Payable," 24 Cath. U. L. Rev. 243 (1975); Wellen, "New Solutions to the Section 357(c) Problem," 52 Taxes 361 (1974).

[13] For purposes of this opinion the assumption of a liability shall be equated with the taking of property subject to a liability.

Third Circuit, which affirmed without opinion our decision in *Rosen v. Commissioner,* 515 F.2d 507 (3d Cir. 1975), affg. 62 T.C. 11 (1974). In *Rosen v. Commissioner, supra,* the taxpayer transferred all the assets and liabilities of his sole proprietorship, which accounted for its income and expenses on the *accrual* method, to his wholly owned corporation. At the time of the transfer there were no accounts receivable, and liabilities exceeded assets, the corporation being insolvent. Rosen remained personally liable for the payment of his proprietorship's liabilities assumed by the corporation. We held, in essence, that the *Raich* doctrine was applicable therein.

However, the facts of the instant case are materially different from those in *Rosen.* Although petitioner's proprietorship was, and his wholly owned corporation is probably, insolvent, as was the case in *Rosen,* petitioner utilizes the cash method of accounting as contrasted with the accrual method of accounting as contrasted with the accrual method involved in *Rosen.* While not required by the rationale of the theory that we propound, nevertheless the bottom line result to a cash basis taxpayer might well be different from the result to an accrual basis taxpayer. This difference in result makes *Golsen* inapplicable[14] to the instant case.

Returning to our rationale we note at the outset that the predecessor of section 357 was section 112(k), I.R.C. 1939, which was enacted in response to the Supreme Court's decision in *United States v. Hendler,* 303 U.S. 564 (1938). In *Hendler,* Hendler Creamery Co., Inc., transferred all its assets to the Borden Co. in exchange for 106,306 shares of Borden's stock, some cash, and Borden's assumption of all Hendler's liabilities as existed as of the date of closing of the exchange. Such liabilities included first mortgage bonds redeemable at 7½-percent premium, current bank loans, and merchandise accounts. Borden paid all these liabilities within a month

---

[14] Furthermore, petitioner's contention in *Rosen* was that the transferee corporation never assumed or took subject to the liabilities at issue within the meaning of sec. 357(c)(1). The assumption was merely formal, since the corporation lacked assets needed for payment. We held, at p. 19, that although petitioner "remained personally liable for the payment of such liabilities, and the creditors never looked to Filmotheque [the transferee corporation] for payment, there is no requirement in section 357(c)(1) that the transferor be relieved of liability."

after closing of title. Hendler, on the transfer, realized a gain of over $6 million but asserted in its tax return that the transaction constituted a tax-free exchange, a reorganization under section 112(i) of the Revenue Act of 1928, and that the cash was distributed in accordance with then section 112(d)(1). It also claimed as a deduction the 7½-percent premium payable in redemption of its bonds by Borden and the unamortized discount on such bonds. The Government asserted that Borden's assumption of the mortgage bonds was money constructively received by Hendler, which was not distributed to its shareholders, and thereby resulted in recognition of gain under section 112(d)(2). However, the Government did not extend its contention to the bank loans and merchandise accounts assumed and paid by Borden. Also it played safe by claiming that the deduction for discount and premium should be disallowed.[15]

The District Court[16] held that Borden's assumption of Hendler's liability did not constitute the receipt of "money or other property" within the meaning of section 112(d) and was not taxable boot. "As to form, the money used to pay the bonded debt was never actually received or distributed, or retained by the corporation; and as to substance, all that Hendler received in the transaction (other than a comparatively small amount of cash distributed to preferred shareholders) was common stock of Borden, representing the equity in its property in exchange for the equity in Hendler property."[17] Additionally, Hendler's deductions for bond discount and premiums were disallowed, because Borden and not Hendler had paid the redemption premium and that when the obligation on the principal of the bonds itself was removed from Hendler's liabilities, it could lay no claim to the unamortized discount.

The Government appealed on the main issue to the Fourth Circuit Court of Appeals and Hendler did not press for the deduction. The Fourth Circuit affirmed the District Court[18]

---

[15] See Surrey, "Assumption of Indebtedness in Tax-Free Exchanges," 50 Yale L. J. 1 (1940).

[16] *Hendler v. United States*, 17 F.Supp. 558 (D. Md. 1936). Hendler's principal stockholder, Mr. Hendler, elected to pay the deficiency and sue for a refund.

[17] *Hendler v. United States*, 17 F.Supp. 558, 568 (D. Md. 1936).

[18] *United States v. Hendler*, 91 F.2d 680 (4th Cir. 1937).

and the United States Supreme Court granted certiorari.[19] In reversing[20] the lower court's decisions Justice Black writing for the Supreme Court stated at page 566:

> We are unable to agree with the conclusion reached by the courts below that the gain to the Hendler Company, realized by the Borden Company's payment, was exempt from taxation under section 112.
>
> It was contended below and it is urged here that since the Hendler Company did not actually receive the money with which the Borden Company discharged the former's indebtedness, the Hendler Company's gain of $534,297.40 is not taxable. The transaction, however, under which the Borden Company assumed and paid the debt and obligation of the Hendler Company is to be regarded in substance as though the $534,297.40 had been paid directly to the Hendler Company. The Hendler Company was the beneficiary of the discharge of its indebtedness. Its gain was as real and substantial as if the money had been paid it and then paid over by it to its creditors. The discharge of liability by the payment of the Hendler Company's indebtedness constituted income to the Hendler Company and is to be treated as such.

Congress immediately responded to nullify the *Hendler* result by enacting section 112(k), I.R.C. 1939,[21] and the Ways and Means Committee Report, H. Rept. No. 855, 76th Cong., 1st Sess. (1939), 1939–2 C.B. 518–519, clearly showed its intent.

It has long been the policy in our income tax law to give due consideration to the exigencies of business in connection with corporate reorganizations by postponing, in certain specifically described instances, the recognition of gain realized in such transactions. In general, if gain is realized in such a

---

[19] *United States v. Hendler,* 302 U.S. 680 (1937).

[20] *United States v. Hendler,* 303 U.S. 564 (1938).

[21] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(k) ASSUMPTION OF LIABILITY NOT RECOGNIZED.—Where upon an exchange the taxpayer receives as part of the consideration property which would be permitted by subsection (b)(4) or (5) of this section to be received without the recognition of gain if it were the sole consideration, and as part of the consideration another party to the exchange assumes a liability of the taxpayer or acquires from the taxpayer property subject to a liability, such assumption or acquisition shall not be considered as 'other property or money' received by the taxpayer within the meaning of subsection (c), (d), or (e) of this section and shall not prevent the exchange from being within the provisions of subsection (b)(4) or (5); except that if, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition was a purpose to avoid Federal income tax on the exchange, or, if not such purpose, was not a bona fide business purpose, such assumption or acquisition (in the amount of the liability) shall, for the purposes of this section, be considered as money received by the taxpayer upon the exchange.

transaction, nonrecognition of the entire gain is allowed only where, under the specifically defined circumstances, the taxpayer transfers property and receives in exchange therefor stock or securities in a corporation which is a party to the reorganization. If, in addition to such stock or securities, other property or money is received, gain is recognized to the extent of such other property or money.

The recent Supreme Court case of *United States v. Hendler* (303 U.S. 564 (1938)), has been broadly interpreted to require that, if a taxpayer's liabilities are assumed by another party in what is otherwise a tax-free reorganization, gain is recognized to the extent of the assumption. In typical transactions changing the form or entity of a business it is not customary to liquidate the liabilities of the business and such liabilities are almost invariably assumed by the corporation which continues the business. Your committee therefore believes that such a broad interpretation, as is indicated above will largely nullify the provisions of existing law which postpone the recognition of gain in such cases. To enable bona fide transactions of this type to be carried on without the recognition of gain, the committee has recommended section 213 of the bill.

Congress chose to postpone the recognition of gain in such cases by amending section 113(a)(6) to reduce the transferor's stock basis by the amount of the liabilities assumed or taken subject to by the transferee.[22] Therefore, it is reasonable to conclude from the above that sections 112(k) and 113(a)(6) were intended to affect only liabilities, similar to those under *Hendler*, that, if assumed (or taken subject to) by the transferee in a tax-free exchange, would cause gain recognition.

Nine years after its decision in *Hendler v. United States*, *supra*, the United States Supreme Court delivered its landmark opinion in *Crane v. Commissioner*, 331 U.S. 1 (1947). *Crane* involved the transfer of real property subject to a

---

[22] "Section 213(d) of the bill amends section 113(a)6 of the Internal Revenue Code to provide that in the determination of the basis under that section any liabilities of the taxpayer assumed by the transferee or to which the transferred property is subject shall be considered as money received by the taxpayer upon the exchange and hence is applicable in reduction of the basis of the property received by the taxpayer on the exchange. This provision applies whether or not the assumption of the liability or the taking subject to the liability is considered money under section 112(k). No amendment is made to section 113(a) (7) or (8), because the payment by the transferee of the liabilities assumed, or to which the property was subject, does not give rise to any increase or adjustment of the basis of the property transferred. [Ways and Means Committee Report, H. Rept. No. 855, 76th Cong., 1st Sess. (1939), 1939–2 C.B. 519.]"

Apparently, secs. 112(k) and 113(a)(6) were broadly and cautiously drafted to protect against an application of the *Hendler* doctrine, not only to assumptions of liabilities but to property acquired subject to the liabilities.

mortgage on which interest was due and unpaid. The Court found that the amount realized by the transferor on the sale included the mortgage, although the transferee did not assume the debt but only took the real property subject to the liability. Citing its decision in *Hendler*,[23] the Court noted the taxpayer conceded that, if she had been personally liable on the mortgage and the transferee had either paid or assumed it, "the amount so paid or assumed would be considered a part of the 'amount realized.' " However the Supreme Court did not consider, as an amount realized by the transferor, the interest due on the mortgage and unpaid at the time of transfer. The Commissioner on brief to the Supreme Court at page 25, footnote 12, conceded that the amount of outstanding interest, taxes, etc., should be disregarded from the computation of the amount realized, "because they were deductible from gross income or from the proceeds of sale." The Court in measuring the amount realized noted, in its opinion, this concession and stated at page 4, footnote 6:

> The Commissioner explains that only the principal amount, rather than the total present debt secured by the mortgage, was deemed to be a measure of the amount realized, because the difference was attributable to interest due, a deductible item.

In light of the Supreme Court's rationale in *Hendler*,[24] it seems highly probable that had *Hendler* pressed its claim for the deductions, and if such items were properly deductible if paid by *Hendler,* the Supreme Court would have sustained this part of the claim. Implicit in this conclusion is the view that *Hendler* foreshadowed *Crane's* exclusionary treatment of assumed deductible liabilities, an exclusion we now find incorporated into sections 357 and 358.[25]

---

[23] See *Crane v. Commissioner*, 331 U.S. 1, 13 n. 34.

[24] "Its [Hendler's] gain was as real and substantial as if the money had been paid to it and then paid over by it to its creditors." *United States v. Hendler*, 303 U.S. 564, 566 (1938).

[25] A transferee's assumption, absent a creditor's relief of the transferor, does not literally satisfy the debt to the creditor. Although there is no statutory justification for granting a transferor a tax deduction until the debt is actually paid, and recognizing there is a paucity of cases in this area, the *Crane* exclusionary approach does offer substantial administrative conveniences. See *James M. Pierce Corp. v. Commissioner*, 326 F.2d 67 (8th Cir. 1964); *Dean v. Commissioner*, 35 T.C. 1083, 1090 (1961); cf. *Royal Oak Apartments, Inc. v. Commissioner*, 43 T.C. 243 (1964).

Furthermore, the same above analysis applies to section 357(c). Although the purpose for its adoption is unclear from the aforenoted House and Senate committee reports, illustrating the transfer of real property with a mortgage in excess of its basis, one can speculate that Congress was dissatisfied with the operation of what is now section 357(b) (the tax-avoidance safeguard to 357(a)) because it was too subjective and dependent upon a determination of a taxpayer's motive. Through transferor's manipulations of credit and depreciation substantial economic gain was going untaxed. Therefore, in 1954, a new test was added to apply in an automatic and mechanical fashion in situations where the transferor realized economic benefit which, if not recognized, would otherwise go untaxed.[26]

It is apparent that in construing section 357, section 357(c) is applicable only as an exception to section 357(a). Where section 357(a) does not apply, section 357(c) should not apply. Hence, the term "liability" in both of these sections should be limited to those obligations that, if transferred, cause gain recognition. An obligation to the extent that its payment would have been deductible if made by the transferor should not be such a liability.

We believe our holding implements the aforenoted congressional intent by preventing the recognition of gain or loss where there has been a mere change in form of ownership in a tax-free reorganization. The transferor has not sustained an economic benefit but only a theoretical gain. The following illustrates this principle. P, a cash basis sole proprietor, has the following assets and liabilities:

---

[26] See *Rosen v. Commissioner*, 62 T.C. 11, 19 n. 3 (1974), *Thatcher v. Commissioner*, 533 F.2d 1114, 1116 (9th Cir. 1976). However many tax commentators suggest that the purpose of the sec. 357(c) enactment was to avoid problems of a negative basis. See Cooper, "Negative Basis," 75 Harv. L. Rev. 1352 (1962); *Easson v. Commissioner*, 33 T.C. 963 (1960), revd. 294 F.2d 653 (9th Cir. 1961).

| Assets | Value | Adjusted Basis |
|---|---|---|
| Marketable securities............................. | $10 | $10 |
| Tangible assets .......................................... | 25 | 25 |
| Accounts receivable................................. | 20 | 0 |
| Total............................................. | 55 | 35 |

| Liabilities | | |
|---|---|---|
| Salary unpaid to employees.................... | | 40 |

P wishes to incorporate his business by transferring the assets and liabilities to his wholly owned shell corporation, "X." Applying our holding that the term "liability," as used in sections 357 and 358(d), does not include an obligation to the extent that its payment would have been deductible if made by the transferor results in the following: P has no section 357(c) gain; his X stock basis is $35; and X's basis in its assets is also $35. Upon sale of his stock P receives $15, the net worth of X, and recognizes a loss of $20. This leaves P in the same position, with respect to his stock, as he was with respect to his proprietorship's assets and liabilities prior to the transfer. X's assumption of P's liabilities is as if X had paid the money to P and then P had paid his creditors. *United States v. Hendler, supra* at 566; *Crane v. Commissioner, supra* at 13; *James M. Pierce Corp. v. Commissioner,* 326 F.2d 67, 71–72 (8th Cir. 1964).

Moreover we note that prior to P's transfer of assets and liabilities to X, P could have withheld $40 of assets to pay his $40 of liabilities. If he had withheld $15 of accounts receivable, the $10 of marketable securities, and $15 of tangible assets to pay his liabilities, he would have recognized $15 of gain on his accounts receivable and would have been entitled to a deduction of $40 on payment of the payables—netting to a $25 loss. P then would have transferred the remaining $5 of accounts receivable and the $10 of tangible assets to X corporation pursuant to section 351. His basis in the X stock would be $10 with a value of $15. Hence on sale of his X stock he would recognize a gain of $5 or, again, an aggregate loss on both transactions of $20.[27]

---

[27] Alternatively, P, prior to transferring his assets and liabilities, could have secured a loan of $40 and used the proceeds to pay his deductible liabilities. Absent the prohibited purpose test of 357(b) (P had a bona fide business purpose in paying his creditors) P would recognize a sec. 162 deduction of $40 and a sec. 357(c) gain, on the transfer, of $5. Sale of his X stock would result in a $15 gain, or again, an aggregate

We have previously noted that Congress was aware that in the typical situation a sole proprietor would not liquidate the liabilities of a business prior to the transfer of his business in a tax-free reorganization and that customarily the transferee corporation would assume such obligations. To avoid perverting the realities of the transaction with unnatural tax consequences the gain at both the shareholder and corporate levels should not be premised on an application of the term "liability" in a pervasive, unrealistic manner. The result under *Raich* taxes the transferor on an amount which never was, and never will be, received by him as an economic gain. It is no answer that the transferee corporation receives a stepped-up basis under section 362 when the transferor had no gain on the exchange.

Unlike the theory adopted by the Ninth Circuit in *Thatcher v. Commissioner, supra,* our result alleviates the problems raised when a cash method taxpayer transfers insufficient receivables to cover the proposed gain under section 357(c). If P transfers to X $35 in cash and deductible accounts payable of $40, the account receivable/accounts payable setoff theory is inapplicable.[28] P would recognize $5 of section 357(c) gain. Under our theory since the accounts payable are deductible if paid by P, their assumption would not fall within sections 357 and 358. In sum, the rule we propound is as follows: the assumption of a deductible obligation of a cash method taxpayer is a nonrealizable event because it is improper to treat the assumed liability as income to the transferor and deny him the tax benefit for its satisfaction.[29] However, a cash basis taxpayer transferring a nondeductible liability realizes

---

loss of $20.

[28] Sec. 1.357-2, Income Tax Regs., raises another problem. Under these regulations it appears that a particular sec. 357(c) gain is to be allocated among the transferred assets according to their respective fair market values and therefore such gain would not necessarily be fully allocable to accounts receivable. Accordingly, part of any such gain could be allocated to transferred capital assets, characterized as long-term capital gain, and the ordinary deduction to which the Ninth Circuit postulated the transferor of accounts payable to be entitled would not constitute a "wash" with the sec. 357(c) gain.

[29] This exclusionary approach, under *Crane,* establishes that the transfer of deductible obligations does not cause gain realization and thus cannot cause gain recognition within the statutory framework of secs. 357 and 358.

gain irrespective of whether he enjoyed a prior tax benefit, as actual payment would generate no additional tax deduction.[30]

We need not decide here the tax consequences to the transferee when it pays the assumed liabilities.[31] For present purposes, we hold that to the extent petitioner's obligations, assumed by the corporation, would have been deductible by him upon his payment, such obligations are not to be treated as liabilities for purposes of sections 357 and 358.

Having previously found that respondent erred in his determination of the precise amount of additional unreported rental income, we turn next to respondent's disallowance of petitioner's various deductions. Petitioner has not offered any evidence to rebut the presumption of correctness of such adjustments and is, therefore, not entitled to deductions in excess of the amounts allowed by respondent. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

RAUM, *J.,* concurs in the result.

SIMPSON, *J.,* concurring: I should like to begin by borrowing the words of Mr. Justice Frankfurter who once said: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Bank,* 335 U.S. 595, 600 (1949). When I wrote the opinion in *Thatcher,* I fully appreciated the consequences of adopting a literal interpretation of section 357(c), but I felt compelled to reach such result. To adjudicate that controversy, we were required to decide whether, when the term "liability" was used in section 357(c), Congress intended for it to have a literal or more restrictive meaning. I consider that our ultimate responsibility is to find out what Congress had in mind when it used the term and to apply such meaning in deciding the case. Of course, I carefully considered the interpretations

---

[30] Similarly the assumption of a liability of an accrual basis taxpayer constitutes gain realization if payment by the transferor, at date of assumption, would not entitle him to an additional tax benefit.

[31] See *Magruder v. Supplee,* 316 U.S. 394 (1942).

suggested by the parties in the *Thatcher* case, those suggested by my colleagues, those adopted by other courts, and those suggested by the writers, but although some of them appeared to provide a satisfactory answer to one set of facts, none of them seemed to be supported by history and to provide a rational application of the provision.

Subsequently, I was very interested in the article "A Definition of 'Liabilities' in Internal Revenue Code Sections 357 and 358(d)" by Kahn and Oesterle in the Michigan Law Review (73 Mich. L. Rev. 461 (1975)). The approach suggested by them appeared to be consistent with the history of the provisions now contained in sections 357 and 358, and it produces results which are rational and which one may conclude were intended by the Congress. I was happy to see that when this case came before Judge Sterrett for decision, he decided to embrace that approach, and I am now glad to join with him in this decision.

WILBUR, *J.*, concurring: The majority begins by retracing the path we followed to error, confessing along the way that an extremely literal interpretation has once again produced harsh results not in conformity with the overall purposes of the statute.[1]

Indeed, one would search in vain for a plainer illustration of the sterile futility of assigning an immutable meaning to a

---

[1] In the typical small business the "owner" labors long hours, usually assisted by a few employees, but with minimal capital. The income is for the most part the difference between net receipts and disbursements—often no more than a fair return on the "owner's" labor. The "owner" may at some point, possibly as a result of his accountant's or lawyer's suggestion that he limit his exposure to liability, spend a few hundred dollars to incorporate. The labor goes on as usual—same place, same customers, same help, same long hours, same modest income, and same small or nonexistent net worth. When no one has perceived the slightest break in continuity, it must be an enormous shock for the man to be told he has a fifty or sixty thousand dollar capital gain consisting (in large part) of his accounts payable. To be sure, significant tax consequences attend incorporation of a business, but it is virtually certain Congress never intended this to be one of them. (As we said in another context in *Thatcher v. Commissioner*, 61 T.C. 28, 35 (1973) affd. in part and revd. in part 533 F.2d 1114 (9th Cir. 1976), "its irrationality constitutes a persuasive reason for not reaching such a result.") It is like telling the taxpayer that his place of business was struck by lightning and burned to the ground, only a little worse, for lightning and fire, unlike "extremely literal" interpretations of the Internal Revenue Code, are catastrophes that can be insured against.

word without regard to the circumstances attending its use.[2] Hopefully we have reached the last chapter of a series of painful episodes providing fresh evidence that the reward of extreme literalism is extreme error.

The standard argument offered for literalism is that Congress must be assumed to have meant what it said, and if it didn't, it should amend the law, not the Courts. This tired old platitude simply begs the question. We may assume Congress meant what it said: the issue is what did it say? If that were so plain, it is passing strange that this Court has produced several extended opinions on both sides of this subject, as have the Courts of Appeals, and the academics and brethren at the bar have found it a fruitful subject for lengthy exegesis in the law journals.[3] In the final analysis, when someone in this context tells us we must assume Congress meant what it said, they are simply opting for one of several possible interpretations of a term without accepting the responsibility for supporting their interpretation with reasoned views.

When it is added that if the law is to be changed it must be changed by Congress, the case is gently rested on the hallowed and unassailable ground of separation of powers. But the second half of the platitude is predicated on the question-begging first half, and even apart from this defect, can no more withstand analysis than the first half. The problem usually arises when (as the majority opinion tells us) an "extremely literal" or "mechanical application" of the statute produces a "harsh" result not in "conformity with the overall purposes of the statute." It is, of course, most unlikely that Congress intended any such result. And it is inconceivable that Congress focused on the matter and decided in favor of the harsh result without leaving any trace of evidence in the legislative record that the specific problem was ever considered.

There are many points in the legislative process, both in the House and Senate, where the views of the public and the interested executive agencies can be considered, and the issue,

---

[2] For a very close second, see the history recounted and the contrasting views expressed in *Sylvan v. Commissioner*, 65 T.C. 548 (1975), and *Holt v. Commissioner*, 67 T.C. 829 (1977).

[3] See n. 12 of the majority opinion.

if considered, would surely have provoked a spark of controversy in light of the fire it ignited in the courts and law journals. What we really have is still another instance of the circumstances described by John Chipman Gray:

The fact is that the difficulties of so-called interpretation arise when the Legislature has had no meaning at all; when *the question which is raised on the statute never occurred to it;* when what the judges have to do is, not to determine what the Legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present. If there are any lawyers among those who honor me with their attention, let them consider any dozen cases of the interpretation of statutes, as they have occurred consecutively in their reading or practice, and they will, I venture to say, find that in almost all of them it is probable, and that in most of them it is perfectly evident, that the makers of the statutes had no real intention, one way or another, *on the point in question;* that if they had, they would have made their meaning clear; and that when the judges are professing to declare what the Legislature meant, they are in truth, themselves legislating to fill up *casus omissi.* [Gray, The Nature and Sources of the Law 173 (Macmillan 1921). Emphasis added. See Cardozo, The Nature of the Judicial Process 14, 15 (Yale University Press 1921).]

Even while sustaining respondent in *Thatcher v. Commissioner,* 61 T.C. 28 (1973), affd. in part and revd. in part 533 F.2d 1114 (9th Cir. 1976), we apparently recognized that Congress had never specifically focused *on the point in question.* We stated:

The resolution of the problem illustrated by this case will require Congress and the Administration to reconsider the mechanical test adopted in 1954 and *to decide what rule should be applied to a transfer of liabilities;* it will then be necessary for them to take appropriate legislative or administrative action. [61 T.C. at 37. Emphasis added.]

We went on to fill in the casus omissi by adopting the worst of the possible interpretations. Having unfortunately done so, we should not remain frozen in error. Since we created the problem before us with our earlier decisions, the Court in this opinion properly takes corrective action rather than leaving the problem to Congress.[4]

---

[4] Respondent often wrings his hands in anguish when he feels compelled to urge the "plain meaning" of a statute to produce a harsh result. As I said in an earlier but in some respects similar context:

"the Internal Revenue Service is a part of the Treasury, whose representatives spend considerable time each year before Congress advancing Treasury proposals in the tax area. Hopefully, since respondent recognizes the harsh results that often stem from tedious interpretations of the present statute, careful attention will be given to

Nothing will be served by a dialectical search for a perfectly symmetrical theory of section 357. For in any event, it is now agreed that the one theory entirely without merit is the one originally adopted by this Court, repudiated by the Second and Ninth Circuits, and now abandoned by us. An interpretation that nearly scores a bull's eye is distinctly preferable to one that fails to even approach the target.

Thucydides asserted that history is philosophy learned from examples, and Santayana added much later that those who cannot remember the past are condemned to repeat it. The example before us will undoubtedly be repeated unless we remember the philosophy of statutory interpretation taught by this unfortunate episode: where a literal interpretation or a mechanical application of the statute produces a harsh, unjust, and absurd result, literalism must give way. As the Supreme Court long ago stated:

It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act. [*Holy Trinity Church v. United States,* 143 U.S. 457, 459 (1892).]

TANNENWALD, *J.,* dissenting: I respectfully disagree with the majority herein. The fact that two Circuit Courts of Appeals and now this Court have had to evolve three different theories, producing differing consequences, in order to qualify the word "liabilities" in section 357(c) provides the clearest basis for concluding that we should accord that word its ordinary meaning. Even the broad-brush approach which the

---

resolving any remaining problems in a legislative context * * *. [*Holt v. Commissioner,* 67 T.C. 829, 842 n. 12 (1977) (Wilbur, *J.,* concurring).]"

We may be sure that if respondent were on the losing end of a harsh result due to an extremely literal and mechanical application of the statute, the Treasury would prescribe a prompt legislative correction for the ensuing distress, assuming a lesser remedy (i.e., regulation, ruling) completely within its control was inadequate. *Raich v. Commissioner,* 46 T.C. 604 (1966), was decided over a decade ago, and *Thatcher,* 4 years ago. Despite the suggestion of a legislative or administrative solution in *Thatcher* (see text above), none of these tools have been employed, and instead the Service is still vigorously litigating to sustain this very harsh result.

Supreme Court adopted in *Nash v. United States,* 398 U.S. 1 (1970), cannot be applied here. At least in that case, the Court was able to accord section 351 a pervasive effect in a situation where the transfer of the item involved was not specifically covered by another provision. By way of contrast, section 357(c) speaks directly to the applicability of section 351 to the transfer of "liabilities." To me, whatever remedial steps may be appropriate should be taken by the Congress and not by the courts. See *Braunstein v. Commissioner,* 305 F.2d 949, 959 (2d Cir. 1962), affd. 374 U.S. 65 (1963). See also *Brewster v. Commissioner,* 67 T.C. 352, 367 (1976). This Court's opinion in *Thatcher v. Commissioner,* 61 T.C. 28 (1973), revd. on the issue 533 F.2d 1114 (9th Cir. 1976), aptly expresses my views and I would continue to follow it.

HALL, *J.,* dissenting: Viewed in relation to our opinions in *Raich, Bongiovanni,* and *Thatcher,* the majority today is far closer to being on target. But unfortunately it has not quite scored a bull's-eye. I adhere to the views expressed in my dissenting opinion, and by the Court of Appeals for the Ninth Circuit, in *Thatcher.*

The majority "construes" the term "liabilities" in section 357 as excluding an obligation "to the extent that its payment would have been deductible if made by the transferor." There are numerous problems with this analysis.

In the first place, it is inconsistent with the plain wording of the statute. The statute provides no such limitation on the word "liabilities." While words undoubtedly take on considerable coloration from their context and purpose, they are not infinitely elastic. The majority would seemingly have a dentist's bill be a "liability" or not according to whether the cash basis taxpayer in question itemized his deductions or claimed the standard deduction, according to whether he had other medical expenses which in total equaled 3 percent of his adjusted gross income, according to the appropriate "stacking" rules used to determine whether the dental bill was part of the 3 percent, part of the excess, or part of each, and according to whether he had any gross income at all that year, or perhaps had a net operating loss carryback to that year from a later year. The word "liability" ought not to be

stretched so far by judges. We tinker with too complex a statutory framework. Cf. *Hempt Bros., Inc. v. United States,* 490 F.2d 1172 (3d Cir. 1974) (refusing to exclude accounts receivable from "property" for purposes of section 351).

Second, the "legislative history" advanced for the majority's theory fails to provide much, if any, support for it. The majority notes correctly that sections 357(a) and 357(c) have no clear legislative history on this point. The majority points to a footnote in *Crane v. Commissioner* in which the Supreme Court noted in passing the Commissioner's position in that case. There the Commissioner had contended, successfully, that the transfer to a third party of property subject to the lien of a nonrecourse debt in excess of the transferor's basis gave rise to gain to the transferor. However, conceded the Commissioner, such gain did not include deductible accrued interest. This footnote, however, provides insufficient reason for us to conclude that Congress in enacting section 357 had anything in mind beyond the normal meaning of the word "liability." It may or may not be that had Congress thought about it, it would have so limited section 357 à la *Crane.* But since we do not sit as a legislature, it is not for us to rewrite the statute.

It has been said, with more than a grain of truth, that judges in tax cases these days tend to consult the statute only when the legislative history is ambiguous. Today, bona fide legislative history being absent, we go one step further by constructing a purely hypothetical legislative history out of a random footnote in a Supreme Court decision. Following a law review article, we unrealistically presume on faith that Congress must have focused on the footnote when it wrote section 357(c). What is wrong with reading the statute?

Third, the majority approach, while well-intentioned, will lead to doubt in every other place in the Code where the word "liability" or "liabilities" appears, whether the strange new meaning with which we now invest that word applies there too. By computer search the word currently appears 400 times. For example, in the rather closely analogous section 752, a partner includes in the basis of his partnership interest his share of partnership "liabilities." When he is relieved of such "liabilities" he is treated as having received a distribution of money. Does this language include liabilities such as

trade accounts payable, deductible to a cash method taxpayer only upon payment? The longstanding Internal Revenue Service interpretation, now thrown into doubt by the majority opinion, is yes. Rev. Rul. 60–345, 1960–2 C.B. 211.

Fourth, the majority approach is conceptually unsound. For one thing, the majority approach runs afoul of the basic principle that a cash basis taxpayer gets no deduction for an expense until it is *paid*. The effect of the majority's approach is to provide the deduction, for all practical purposes, when it is *assumed*, whether or not paid. Return to the dental bill, for example, and assume favorable resolution of all the ambiguities over whether it is sufficiently "deductible" to meet the majority's test. Assume that the cash method debtor transfers $100 of trade receivables to his corporation in exchange for its stock and the assumption of a $100 dentist's bill. Suppose that the corporation never pays the bill but obtains the dentist's release in consideration of recommending the dentist to corporate employees. Under the majority analysis, the taxpayer, who has gotten $100 of money's worth out of his trade receivables and never paid the dentist, will evidently go untaxed. This points up an important distinction between the majority's analysis and that of the Ninth Circuit in *Thatcher*. In the latter analysis, there is no deduction to the transferor until *payment* occurs. The exchange triggers immediate recognition of gain on the transferred assets to the extent of the excess of liabilities assumed over basis of assets transferred; the offsetting deduction to the transferor arises only if and when payment of a deductible liability is made by the transferee on the transferor's behalf. Furthermore, the majority analysis produces materially different results from only formalistically different procedures. While the tax law regrettably contains other such anomalies, we should draw back and reconsider the theoretical soundness of our position before creating new ones. The majority's analysis produces ultimate tax consequences which differ according to whether the taxable exchange of appreciated property for the assumption of unbooked liabilities in excess of basis occurs separately from, or as an incident of, an incorporation. To illustrate the point, assume the following posture of a cash basis taxpayer:

| | Value | Adjusted basis |
|---|---|---|
| *Assets* | | |
| Long-term securities | $1,000 | $600 |
| *Liabilities* | | |
| Trade accounts payable | 900 | 0 |

If, not in connection with an incorporation, he sold the securities and paid the payables with $900 of the proceeds, he would have $400 of long-term capital gain and a $900 deduction.

Under the majority's analysis, the taxpayer can incorporate, have his corporation assume the payables, and avoid all tax on the incorporation exchange. But by having the corporation pay his bills for him, he has effectively realized $300 of the $400 appreciation on his securities. He has gotten $900 of money's worth out of his appreciated securities. This is just as true whether the bills his corporation will pay for him would be deductible to him or not. The majority errs in stating that this is "something that was not in fact economic gain to a cash basis" taxpayer. There is economic gain, very clearly, when one uses appreciated property to get someone else to pay his bills. True, to the extent of the $600 adjusted basis of the transferred assets, section 357(a) and regulations section 1.358–3(b) decree that there is deemed to be a return of basis rather than taxable income on the relief of debt. But after the $600 basis of the transferred assets has been exhausted, and the transferor's basis in his stock in the new corporation has thereby been reduced to zero, under regulations section 1.358–3(b), example (2), gain should be recognized to the extent of the $300 remainder of the liabilities assumed. That being so, there is no good reason why the tax consequences should be any different as to the taxable portion of such exchange than the consequences of a similar taxable exchange of $300 of assets for relief of $300 of liabilities outside the context of the incorporation. If the liabilities assumed are deductible and are paid by the transferee, there should be a deduction to the transferor, who has in effect paid them by proxy. Any deduction should await *payment,* but the $300 deduction should be available to the transferor, not the transferee. The transferee corporation should be treated as having *purchased* $300 worth of the securities with the $300 of liabilities it assumed in the taxable transaction. Because of the incorporation and the operation of section 357(a), $600 of

the $900 deduction will not flow to the transferor, but under section 357(c), the $300 excess should flow to the transferor.

A further serious difficulty with the majority's approach is that its effect reaches far beyond the rather infrequent occasions where liabilities assumed *exceed* adjusted basis and section 357(c) is involved. By reading "liabilities" as "non-deductible liabilities," the majority also is making a fundamental change in the meaning of sections 357(a) and 357(b). Henceforth, if the majority's position becomes accepted, the assumption of trade accounts payable or other "deductible" debts in a section 351 exchange will no longer be treated as an offset to basis in the transferor's stock. This will give rise to no end of confusion over basis both of corporate stock and corporate assets. And taxpayers will now be free to use assumption of *deductible* debts for tax-avoidance purposes despite section 357(b). (For example, a taxpayer seeking to avoid the minimum tax on excess itemized deductions under section 57(b) can transfer zero basis receivables to his new corporation in exchange for the corporation's assumption and ultimate payment of, say, his charitable pledge.) While the majority is seeking to achieve a reasonable solution to the conundrum, its wrenching of the word "liabilities" to force the right answer has collateral consequences out of all proportion to the very problem it addresses. Reading section 357(c) as written, but allowing the transferor the deduction (to the extent section 357(c) makes the exchange taxable) on the same terms as he would get it in any other taxable exchange of assets for debt relief avoids these difficulties, leaves the rest of section 357 where the legislature left it, and ends up with the correct and fair result.

Fifth, the majority's straining to reinterpret the word "liabilities" in an unnatural manner is unnecessary to cure the problem it perceives with the statute. The majority saws against the grain in struggling to avoid the application of section 357(c). It would be far easier to read the word "liabilities" in its normal sense. Reading it in that sense does no violence either to the statute or to equity if we simply recognize that a corollary of recognition of gain under section 357(c) is an offsetting deduction, if and to the extent that assumption and payment of deductible liabilities is the price for which there was a taxable sale of appreciated assets. The

very example chosen in the majority opinion to attack the theory nicely illustrates the point. P transfers to X $35 in cash and X assumes $40 of deductible trade accounts payable. The majority opinion would shield P from gain although he is clearly $5 ahead economically. He paid $35 but he got $40 of his bills paid for him. What matter whether the bill is deductible? The Ninth Circuit approach would be *first* to require inclusion of the $5 gain, and *then* to allow the transferor up to a $5 deduction as and when the payables *are* paid if they are of a deductible nature to him. If indeed the payables *are* paid in the same taxable year, the net result of either approach to the transferor is the same. But if they are *not* so paid, the Ninth Circuit approach reaches a correct result; the majority, in effect, erroneously accelerates the cash basis taxpayer's $5 deduction merely because the taxable exchange in question happened to be with a corporation rather than some other entity.

The Ninth Circuit approach, moreover, provides a straightforward answer to the question the majority leaves open—the tax consequences to the transferee. There is, and should be, no deduction to the transferee on payment of that portion of the payables, assumption of which was part of the taxable section 357(c) exchange. Payment of that portion of the payables was simply the cost of the assets purchased by the assumption of the payables. *Holdcroft Transportation Co. v. Commissioner,* 153 F.2d 323 (8th Cir. 1946). The face amount of that portion of the payables adds to the transferee's basis in such assets. As a matter of appropriate allocation, the taxable part of the payables (here $53,512) should be netted first against receivables (here $42,237.10) and then any balance against other assets (except cash) in proportion to their respective fair market values under the principles of section 1.357–2, Income Tax Regs. The result in this case is that $11,274.90 of gain has been realized on inventory and fixed assets. To that extent, gain has been recognized on those assets, its character being dependent upon their tax nature. Some portion may be capital gain. This case, accordingly, provides a good illustration of a further fallacy in the majority's theory. By not applying section 357(c) as written, the taxpayer is to a limited extent deprived of the tax benefit inherent in obtaining an ordinary deduction on payment of

the payables, with an offsetting gain which may in part be a *capital* gain. Such situations may be unusual because in most incorporations trade receivables will exceed payables. But they do exist, as here, and where they do, the Ninth Circuit analysis, unlike the majority's, reaches the correct result.

Since the findings of fact in this case do not disclose whether the liabilities were in fact paid, or in what year such payment took place, I would condition allowance of the offsetting deduction upon production of appropriate proof of payment. Because this Court's prior opinions failed to put the taxpayer on notice that such proof would be required, I would reopen the case for evidence on this point.