*Decision will be entered under Rule 155.*

WILLIAM P. ORR AND SARA J. ORR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6807–78.     Filed June 17, 1982.

---

*Meyer Weiner*, for the petitioners.
*Kenneth J. Rubin*, for the respondent.

WILES, *Judge*: Respondent determined deficiencies in petitioners' 1973 and 1974 Federal income taxes of $65,230 and $1,303, respectively. After concessions,[1] the issues for decision are: (1) Whether petitioners transferred all the assets of their sole proprietorship, Schoolroom Tours, to their controlled corporation in exchange for stock and the corporation's assumption of Schoolroom Tours's liabilities; (2) whether petitioners recognized ordinary gain pursuant to section 357(c),[2] upon the incorporation of Schoolroom Tours.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners William P. Orr (hereinafter William) and Sara J. Orr, husband and wife, resided in Wernersville, Pa., at the time they filed their petition in this case. Petitioners filed their 1973 and 1974 joint tax returns with the Internal Revenue Service Center, Philadelphia, Pa.

During 1972, William organized and began operating a travel tour business known as Schoolroom Tours (hereinafter ST), which arranged vacation packages[3] for individuals and organizations. He initially operated this business as a sole proprietorship, and he set up a desk in his home to store business records. William's mother-in-law, Mrs. Garhardt

---

[1]The deficiency for 1973 was based upon respondent's determination that petitioners failed to report $129,123.33 of ordinary gain generated by the operation of secs. 351 and 357(c). On brief, however, respondent conceded that the amount of such gain for 1973 should only be $116,022.47. In addition, respondent has conceded that there is no deficiency for 1974.

[2]Statutory references are to the Internal Revenue Code of 1954 as amended.

[3]The price paid by a customer for a vacation package generally included, among other things, airfare and hotel accommodations.

(hereinafter Garhardt), helped William maintain records for his travel business.

William generated business for ST by printing advertising flyers which listed various vacation packages and distributing the flyers to various school organizations, factories, and businesses. Anyone who was interested in one of the listed vacations would fill out a coupon that was at the bottom of each flyer and mail the coupon to ST, along with a partial downpayment, in advance of the vacation date.

Whenever William received a coupon and a downpayment from a customer, he or Garhardt would put that person's name on an index card, the downpayment made by that customer, and the balance due. William deposited the moneys received from customers into his personal checking account at the American Bank & Trust Co. (hereinafter the American Bank). Portions of the payments made by ST's customers would eventually be used to cover the cost that ST incurred when it booked the vacation package.[4]

In addition to his travel business, William was employed as a full-time biology teacher by the Wilson School District of Berks County, Pa., during 1972 and 1973. Beginning in the fall of 1972 and continuing through 1973, William's vacation business increased dramatically.[5] During this period, William was going to the American Bank almost daily, depositing thousands of dollars of customers' downpayments on each visit. Due to his full-time teaching job, however, William was unable to devote the time that his growing vacation business required. Consequently, in 1973, he hired a few more people to help Garhardt handle ST's increasing paperwork, and Robert Boltz was hired to be the executive director of the business.

---

[4]Although the record indicates that ST did not book a vacation with an airline or a hotel prior to receiving moneys from its customers, it is not clear how soon after receiving moneys from customers that ST made such arrangements. The record further indicates that after ST provided its customer with the promised services (i.e., vacation package), the excess of the customer deposits over the expense of providing such services would be applied to ST's income account. We also note that the record indicates that ST had to return moneys to customers whose trips could not be arranged by ST.

[5]On William's 1972 tax return, he reported gross receipts from his vacation business of $45,500. In 1973, petitioners incorporated ST, and it reported gross receipts of $1,499,481.72 for such year. The record indicates that the corporation was originally planned to operate on fiscal years ending Mar. 31. By filing a tax return for the 1973 calendar year, however, the corporation apparently decided against operating on a fiscal year basis.

Early in 1973, William informed his family attorney, Mr. Biehl (hereinafter Biehl), that he was thinking about incorporating ST. Biehl advised William that he could prepare books of incorporation, issue the stock certificates, and handle everything else necessary to incorporate ST. The idea of incorporating ST, however, did not originate with William or Biehl. Prior to his meeting with Biehl, William had been advised by Mr. Myatt (hereinafter Myatt), the manager of the American Bank branch where William maintained his personal checking account, to incorporate ST. Myatt had noticed that William was depositing customers' payments into his personal checking account, and he advised William that it would be best for all concerned if William incorporated ST and established a separate bank account for his travel business.

On January 13, 1973, William met with John Good, Jr. (hereinafter Good), a certified public accountant who was the principal of John Good Associates, an accounting firm. William informed Good that he intended to incorporate ST, that he wanted everything transferred to the planned corporation except two real estate properties[6] that he owned, and that he was particularly interested in employing John Good Associates to gather the necessary information to prepare a statement of ST's assets and liabilities immediately before its incorporation. William also advised Good that a meeting would be held at Biehl's office on February 8, 1973, to discuss additional details of the incorporation.

On February 8, 1973, petitioners, Biehl, and Good held a meeting to discuss the planned incorporation of ST. At the meeting, Good had noted that section 351 would apply upon the incorporation of ST, but no one at the meeting had any knowledge as to the amount of ST's assets and liabilities. In addition, the following other matters were resolved at this meeting: (1) Petitioners would be the two incorporators of ST and would serve as officers of the corporation; (2) the corporate office would be at 507 Hill Road, Wernersville, Pa., which was also petitioners' residence during 1973; (3) Biehl would be the

---

[6]The record is not clear as to whether these two real estate properties were a part of, or otherwise ever used by, William's travel business when it was a sole proprietorship. In any event, these two properties were not transferred to Schoolroom Tours, Inc., the corporation which was formed to continue ST's travel business.

corporation's attorney; (4) 100,000 shares of $100 par value stock would be authorized, although the only amounts planned to be issued were 5 shares each to William and his wife.

On or before February 16, 1973, John Good Associates assigned Richard Strohman, an accountant at the firm, the job of setting up the books and records for the corporation which would carry on ST's business. In trying to gather the information needed to determine what would be the opening assets and liabilities of the corporation, Strohman found that ST's records were inadequate. Consequently, Strohman asked the company's employees for required information, but due to the poor records that had been maintained prior to incorporation, the information that they furnished was sometimes inaccurate.

On February 22, 1973, ST was incorporated pursuant to the laws of the State of Pennsylvania and named "Schoolroom Tours, Inc." (hereinafter ST, Inc.). On March 27, 1973, ST, Inc., issued 5 shares of its stock to each of petitioners, and these shares represented the total outstanding stock of ST, Inc. After ST's incorporation, ST, Inc., did in fact carry on the travel business which had been carried on by ST.

Sometime after ST's incorporation, Strohman reconstructed ST's assets and liabilities as of February 16, 1973. His reconstruction, which was based on his direct knowledge of the company's financial situation and on information furnished by employees of the company, revealed that 6 days prior to ST's incorporation, ST's liabilities exceeded the basis of its assets by $39,228.41. Strohman reflected this excess by entering for ST, Inc., the following opening book entries, which were based on Strohman's reconstruction of ST's assets and liabilities as of February 16, 1973:

| Explanation[1] | Debit | Credit |
|---|---|---|
| Cash in bank | | |
| American Bank & Trust Co. .......... | $448,215.77 | |
| Cash in bank | | |
| Escrow accounts—time deposits ...... | 200,669.41 | |
| Capital—William Orr ..................... | 39,228.41 | |
| Customer deposits on tours .............................. | | $688,113.59 |

[1] We note that the parties agree that for accounting purposes, cash in bank and customer deposits on tours are treated as assets and liabilities, respectively.

After Strohman had made the above-mentioned entries in

ST, Inc.'s general journal, he became aware of the following additional information with respect to the company's financial condition immediately before its incorporation: (1) Cash assets were overstated by $100,000; (2) prepaid expenses were understated by $51,895. Furthermore, in July 1973, Strohman discovered that customer deposits on tours as of February 16, 1973, were $28,689.06 more than he had calculated pursuant to his reconstruction of ST's assets and liabilities. Strohman considered the possibility that this additional $28,689.06 in customer deposits was received by ST immediately prior to its incorporation and overlooked by him when he originally computed the amount of customer deposits, but he was not certain that such was the case.

In the notice of deficiency, respondent determined that petitioners realized a $129,123.33 ordinary gain in 1973, pursuant to section 357(c), upon the transfer of ST's assets and liabilities to ST, Inc. On brief, respondent conceded that petitioners only recognized $116,022.47 of ordinary gain pursuant to section 357(c), computed as follows:

*Assets and liabilities of ST transferred to ST, Inc.*

| | |
|---|---|
| Cash in banks | |
| (American Bank & Trust Co. | |
| and escrow accounts—time deposits) | $548,885.18 |
| Prepaid expenses | 51,895.00 |
| Total assets | 600,780.18 |
| Customer deposits on tours[1] | 716,802.65 |
| Accrued expenses—accounts payable | 8,820.70 |
| Total liabilities | 725,623.35 |
| Liabilities for purposes of sec. 357(c)[2] | 716,802.65 |
| Less total basis of assets | 600,780.18 |
| Liabilities in excess of basis | 116,022.47 |

[1]Respondent takes the position that Strohman had overlooked $28,689.06 in customer deposits when he initially reconstructed the entries for ST as of Feb. 16, 1973.

[2]The parties have agreed that the $8,820.70 accrued expenses—accounts payable liability is not to be considered a liability for purposes of sec. 357(c). See *Focht v. Commissioner*, 68 T.C. 223 (1977).

## OPINION

We must determine whether petitioners transferred all the assets of their sole proprietorship to their controlled corporation, ST, Inc., in exchange for stock and the corporation's assumption of ST's liabilities. In the event we find that there

was such a transfer, we must determine whether petitioners recognized ordinary gain pursuant to section 357(c) upon the incorporation of ST.

Section 351 generally provides that no gain or loss shall be recognized if property is transferred by one or more persons to a corporation and immediately after the exchange such person or persons are in control of the corporation. Section 357(c) provides, however, that to the extent that the amount of liabilities assumed exceeds the adjusted basis of the property transferred, the excess shall be considered as gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.

Petitioners have advanced two alternative arguments in support of their position that no gain was recognized upon the incorporation of ST. First, they argue that respondent has presented no evidence of any agreement which establishes that ST's assets were transferred to ST, Inc., in exchange for stock and the assumption of ST's liabilities. Second, petitioners contend that even if there was such an exchange, the liabilities transferred (i.e., customer deposits on tours) should not be considered liabilities for purposes of section 357(c).

Respondent, on the other hand, maintains that petitioners transferred ST's assets to ST, Inc., in exchange for stock and the assumption of ST's liabilities, and that this transaction constituted a taxable exchange under section 357(c). For reasons set forth below, we hold for respondent.

Petitioners contend that respondent has presented no evidence that petitioners transferred ST's assets to their controlled corporation, ST, Inc., in exchange for stock and the assumption of ST's liabilities. We find petitioners' argument in this respect to be somewhat confused because petitioners, not the respondent, carry the burden of proof in this proceeding. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. In any event, the record provides ample evidence to support respondent's position.

When William had his first business meeting with Good on January 13, 1973, Good was informed that William wanted to incorporate his sole proprietorship and that he wanted everything (except certain real estate) transferred to ST, Inc. Although there was no formal agreement as to which assets would be transferred to ST, Inc., and which liabilities would be

assumed by the corporation, there is no such requirement imposed by section 351.

Furthermore, when petitioners, Good, and Biehl had a business meeting on February 8, 1973, Good had noted that section 351 would apply. ST's inadequate financial records, however, prevented them from knowing the total amounts of ST's assets and liabilities, and, thus, they probably were unable to foresee the operation of section 357(c) at such time. Moreover, the record clearly reveals that after ST was incorporated, ST, Inc., carried on the same business that had been carried on by ST. We think that these facts show that petitioners transferred ST's assets to ST, Inc., in exchange for stock and the corporation's assumption of ST's liabilities.

Petitioners alternatively argue that even if ST, Inc., assumed all of ST's customer deposits, these liabilities should not be considered liabilities for purposes of section 357(c) because the rule that this Court stated in *Focht v. Commissioner*, 68 T.C. 223 (1977), applies specifically to the instant case. We disagree.

*Focht* involved a taxpayer (F) who owned a plumbing and heating business. The business was conducted as a sole proprietorship and operated on the cash receipts and disbursements method of accounting. In 1969, F decided to incorporate his business, and, during 1970, he transferred all of the assets, including accounts receivable, of the sole proprietorship in exchange for all of the stock of the corporation, plus the assumption by the corporation of all of the liabilities, including accounts payable of the sole proprietorship. The sum of the liabilities assumed by the corporation exceeded the total adjusted basis of the sole proprietorship's assets, and, thus, the Commissioner maintained that F recognized gain under section 357(c). F argued that the accounts payable of his sole proprietorship should not be considered liabilities for purposes of section 357 because they constituted obligations which would have been deductible by him if paid by his sole proprietorship. Due to the amount of the accounts payable assumed by the corporation in *Focht*, if F's position prevailed, he would not recognize any gain under section 357(c).

We agreed with F and held that the accounts payable of his sole proprietorship were not liabilities for purposes of section 357. If the Commissioner's position had prevailed, F would

have recognized a gain under section 357 that would have been more theoretical than real. By incorporating his business, we concluded that F had merely changed the form of ownership of his business, but had not realized any real economic benefit. This conclusion was based on the fact that the accounts payable of his sole proprietorship would have been deductible when paid by F had his business not incorporated. In fact, if F had conducted his sole proprietorship on the accrual basis of accounting, he would have enjoyed the tax benefit of a deduction for accounts payable for the year when such accounts arose; then any section 357(c) gain caused by his corporation's assumption of accounts payable would have been offset by the deduction he could claim for those accounts. Since F had conducted his sole proprietorship on the cash basis of accounting, the Commissioner's position created the potential for disparate tax treatment upon the incorporation of a business depending upon whether the sole proprietorship had operated on the cash or accrual basis. While the Commissioner's position for a mechanical application of section 357(c) was defensible under a literal reading of the term "liabilities," we held that Congress did not intend such a result, and, thus, we set forth the following rule[7] (*Focht v. Commissioner, supra* at 237–238):

the assumption of a deductible obligation of a cash method taxpayer is a nonrealizable event because it is improper to treat the assumed liability as income to the transferor and deny him the tax benefit for its satisfaction. However, a *cash basis* taxpayer transferring a *nondeductible* liability realizes gain irrespective of whether he enjoyed a prior tax benefit, as actual payment would generate no additional tax deduction. [Fn. refs. omitted.]

The customer deposit liabilities at issue in the instant case, however, are clearly distinguishable from the accounts payable in *Focht*. Although ST was operated on the cash basis, its customer deposit liabilities did not represent obligations which would be deductible when paid. The customer deposits represented obligations of petitioners to perform future services (vacation trips) for customers who had already paid for them. In the event a vacation trip was not delivered, petitioners had an obligation to refund the amounts paid to the respective

---

[7]We note that our holding in *Focht v. Commissioner,* 68 T.C. 223 (1977), has been codified in sec. 357(c)(3)(A) for transfers occurring on or after Nov. 6, 1978.

customers. Any such refunds were not deductible expenditures because ST did not take the customer deposits into income until after it provided the services for which its customers paid.[8] Moreover, in the event that the services (vacation trips) were provided by ST, the customer deposit liabilities did not represent obligations which would be deductible when paid. Although any expenses which ST incurred to provide vacation trips for its customers could qualify as deductible business expenditures, such business obligations would not arise from ST's customer deposit liability account, but from a liability account for accounts payable. Accounts payable were paid from cash, not from customer deposit liabilities. We further note that respondent agrees that ST's $8,820.70 of accounts-payable accrued expenses which he determined were assumed by ST, Inc., are not liabilities for purposes of section 357(c). We think that the customer deposit liabilities in the instant case are akin to loan proceeds obtained by a business. Simply because loan proceeds may be expended on deductible items does not bring the loan obligation outside of the definition of liability for purposes of section 357. Similarly, the fact that the customer deposits that ST received gave the company a source of cash which could be expended on deductible items should not bring the customer deposit liability account outside of the definition of liability for purposes of section 357.

Having found that petitioners transferred ST's assets to ST, Inc., in exchange for stock and the corporation's assumption of ST's liabilities, we uphold respondent's determinations, as reflected by his concessions noted *supra,* of the amounts of such assets and liabilities. Petitioners have argued that respondent's determinations with respect to such amounts must be inaccurate because they are based largely on Strohman's reconstruction of ST's assets and liabilities 1 week prior to its incorporation. Petitioners have not, however, introduced sufficient evidence which indicates that the amount of assets and liabilities transferred to ST, Inc., differed from that

---

[8]Respondent has not raised as an issue petitioners' method of accounting for advances received from customers.

determined by respondent.
  To reflect the foregoing,

*Decision will be entered under Rule 155.*